(75 South. 655)

No. 20668.

THEODORE v. ELLIS.

(Jan. 15, 1917. On Rehearing, June 11, 1917.)

*(Syllabus by Editorial Staff.)*

1. PHYSICIANS AND SURGEONS ⬤⟿18(8)—ACTIONS FOR MALPRACTICE—WEIGHT OF EVIDENCE.

In an action against a surgeon for suffering and injuries claimed to have been due to unnecessary operations, evidence *held* to show that defendant did not tell plaintiff that an operation would entirely cure him.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 43.]

2. PHYSICIANS AND SURGEONS ⬤⟿18(8)—ACTIONS FOR MALPRACTICE—WEIGHT OF EVIDENCE.

In an action against a surgeon for malpractice, evidence *held* to show that the first of two operations performed by defendant was justified, but that the second operation in which a portion of the prostate gland was removed without first resorting to other recognized methods of treatment amounted to a failure to exercise the required degree of care and skill.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 43.]

3. PHYSICIANS AND SURGEONS ⬤⟿16—LIABILITY FOR MALPRACTICE—CONSENT OF PATIENT.

That a patient consented to an operation which was unnecessary and improper, as defendant knew or should have known, did not relieve defendant of liability where the patient merely assented to what defendant told him was the proper course to be pursued, especially where defendant did not explain the object of the operation, or that the same result might possibly be accomplished without an operation.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 31.]

4. PHYSICIANS AND SURGEONS ⬤⟿18(11)—MALPRACTICE—DAMAGES.

Where defendant performed an unnecessary operation on plaintiff resulting in suffering and unnecessary danger and in the loss of the prostate gland, a portion of which was removed, which was possibly unnecessary, a judgment for $2,000 would be proper.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 46.]

5. EVIDENCE ⬤⟿20(1)—JUDICIAL NOTICE—SURGEON'S CHARGES.

Judicial notice may be taken of the fact that the charge for a surgical operation is not according to any fixed rule.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 24.]

Appeal from Eighteenth Judicial District Court, Parish of Acadia; William Campbell, Judge.

Action by Anastople D. Theodore against Dr. E. W. Ellis. From the judgment, plaintiff appeals. Judgment set aside and rendered.

Peyton R. Sandoz, of Opelousas, for appellant. Percy T. Ogden and Philip S. Pugh, both of Crowley, for appellee.

PROVOSTY, J. Two surgical operations were performed on plaintiff by defendant at the latter's sanitarium at Crowley, La. The plaintiff contends that these operations were unnecessary, and were resorted to by defendant through ignorance, or else want of due care, or, worse still, through the mere lust of operating; and that the first of them, through incompetency or want of due care on the part of defendant, or on the part of the attendants of the sanitarium for whom defendant is responsible, caused unnecessary suffering; that as a result of these operations he has lost forever his manhood powers, and is forced to wear a portable urinal for the rest of his life—all to his damage $35,000. He is an immigrant from Greece, 36 years old. At the time of the operation he resided at Opelousas, La., where he carried on a candy manufacturing and a restaurant business. The operations were performed in

February, 1913, and this suit was tried in January, 1914. For some time prior to February, 1912, plaintiff had been troubled with escape of urine during sleep and with losing of weight. The prescription of his home physician having done him little good, if any, he went to New Orleans, in April, 1912, and consulted Drs. Ader and Swords, genito-urinary specialists. Their medical report shows:

"Patient very nervous; urethra slightly constricted; urine extremely acid, highly colored, containing pus and mucus; chronic inflammation of the bladder.; sexual power slightly weak."

He testified: That their prescription cured him, and that in June, 1912, he went on a visit to his mother in Athens, Greece, and that, the slight escape of urine reoccurring, he consulted a physician there and was again cured. But that in December, 1912, the bed wetting began again, and that in February, 1913, having heard of defendant's reputation as a physician, he went to consult him. That he was then in good health, none of his faculties in any way impaired, save for the inability to control his urine during sleep. That he told defendant of this trouble, and of having consulted the several physicians above named, and of the result. That defendant made no physical examination of him, but drew some urine by means of a catheter, and put water, about 20 ounces, in his bladder, and directed him to void it, which he did with a strong stream. That defendant told him that treatment might afford relief, but that to be cured he would have to undergo an operation, and that this would make him a well man again, and that the operation, would not be serious, and the suffering could be alleviated. That he (defendant) knew what the trouble was. That it was bladder stones. That defendant showed him a large bladder stone which defendant said he had taken from an old man a few days previously; that he (plaintiff) went home to arrange his affairs, and on the next day returned to the sanitarium, and on the day following was operated on. The operation consisted in the superbubic opening of the bladder for the purpose of completely emptying and, washing it. "About five days after the operation," says plaintiff, "one night I suffered so much that about 9 or 10 o'clock I called nurse and told her I wanted a doctor, as I couldn't stand it. The nurse said that at that time of the night she could not call doctor. I told her I would pay any kind of price. The head nurse came about 2 o'clock in the morning. The drainage tube was stopped up and blood came out of the operation. She tried to make a tube, and could not. She said Dr. Ellis would come to-morrow. She gave me morphine. Next day about 8:30 I hear something burst, and I am sick so much and have so many pains. I couldn't see, but I put my hand down and I see from my hand that blood come, and I called nurse. Nurse came and see that, and say, 'My goodness!' I wait to see Dr. Ellis. He came and see that, and he told nurse to bring some water, and he cleaned it up, and he said he could not see where it come from. Q. What come from? A. Blood. Same time he took that out he found tube was out, and he said he can't understand how that happened. He said that he was going to put tube back again, but I suffered so much I never said anything to him, but he told nurses that he was going to operate to-morrow again. I did not have any more courage. I thought I was going to die. After Dr. Ellis left I called nurses and told them I felt all right after an hour. I told nurse what Dr. Ellis say, and she said that he was going to operate again, and I told her I did not think that I needed any more operation, and nurse said, 'I am no doctor.' I says, 'Yes, you are no doctor, but I want you to tell doctor I feel pretty good.' She told me that I was under the doctor's care, and if he wanted to cut me again, she

could not help it. Dr. Ellis came about 4 o'clock same day and asked me how I felt. I told him I felt fine, and I sleep three or four hours now; since all blood come from my bladder I sleep about three or four hours. He asked me if I felt all right. I told him I felt fine. He told me he was going to operate to-morrow again. I told him I did not want any more operation, and he said needed it. He told me he was the doctor, and you came here to get well. Q. He told you, 'I am the doctor, and you came here to get well?' A. Yes, sir. I told him that I came to get well. He said that he would see that I got well. I asked him for what he was going to operate now. He told me on bladder, but it would not be as bad as first operation."

This second operation consisted in the removal of one of the lobes of the prostate gland.

Plaintiff testified further as follows:

"Q. Now, Mr. Theodore, did Dr. Ellis tell you before the second operation that he was going to remove your prostate gland, or any part of that gland? A. No, sir. Q. Did you at that time know where that prostate gland was? A. No, sir. Q. Did Dr. Ellis at any time ever tell you that he was going to remove prostate gland, or a portion of it, and explain to you the result of such an operation? A. No, sir. Q. Has he ever before or since explained to you what that second operation was, or its nature? A. No, sir."

Plaintiff further testified that since then the dribbling of urine has been continuous; that he has had to wear a portable urinal all the time; that five days after leaving the sanitarium he felt sick, and went to Crowley to see defendant, and that defendant gave him pills to take, saying it would help him, and told him he would have to wear the urinal the rest of his life, and that the operation had done him no good; that the next day he went again to see defendant, and that defendant asked him for his check, and he said to defendant, "What check?" and defendant answered, "For the hospital bill," and that he gave defendant a check for $94, $10 of which was for the use of the operating room; that after a few days at home, he consulted a local physician, who advised him to go to New Orleans, and he did so, and consulted Drs. Ader and Swords, who gave him treatment which was in a way beneficial, in that it built him up; that before the operation his only trouble consisted in the inability to retain his urine at night, whereas after the operation the urine came thick and of a very offensive odor; that before the operation he slept well, his appetite was good, and he could attend to his business, whereas, since the operation he has not slept well, has not had much appetite, has not been able to attend to his business.

Dr. Ellis' version of the matter is as follows:

"Some time during February, 1913, Mr. Theodore, the plaintiff in this case, accompanied by Mr. Memtsas, of Crowley, consulted me while I was at the Crowley sanitarium one afternoon in regard to the physical condition of Mr. Theodore. Mr. Theodore stated: That he came to me because he had heard of me through Mr. Memtsas, and others, as being a mighty good doctor, and stated that he was very sick, and had been in a very bad condition for the past two years. That his condition was all the time getting worse, and he wanted me to cure him. He stated that his trouble began about two years previous; first he noticed difficulty of urination, and then wetting of the bed. That this condition had gradually grown worse until he had no control over his bladder. That he suffered a great deal of pain while trying to urinate, straining, but could not make it come. That in the past few months he was unable to control his urine at all. That he would either have to remain in the toilet almost all of the time, else soil his clothing. That he suffered pain at the neck of his bladder. That he was getting weaker all the time, and that he had taken treatment from a good many doctors, and had received no benefit. That he had been treated by doctors in Opelousas, by specialists in New Orleans, and having received no benefit from them, that he even made a trip to his native country to consult a doctor of his own race, which he did some time during the summer of 1912. That he received no benefit from his treatment. I asked him if he had irrigated his bladder, and massaged his prostate, all of which he answered me in the affirmative. He asked me if I could cure him. I told him that these were bad cases, and as he had been going from bad to worse for a long time, and no doubt had been under the care of competent men, that I could

not say what I could do for him. That I would try and do the very best I could. That he evidently needed something done for him, and if he would consent, that I would first irrigate his bladder. That I would like to, however, first have a sample of his urine in order to ascertain the condition of his bladder, and also his kidneys, whereupon he told me that he had just urinated before coming to the sanitarium, and he could not pass any more. I then attempted to pass a soft rubber catheter, which I failed to do. I took a metal catheter and passed it into his bladder, drawing off several ounces of urine, which I retained in a bottle and set aside for chemical and microscopical examination. I then introduced a double flow metal catheter into the bladder and irrigated same with hot boric acid solution. I did this under great difficulty, as the patient was very nervous and complained at the time with excruciating pain. He then insisted that I could cure him, and, if so, how much I would charge. I told him from the fact that he had several ounces of retained urine in his bladder, that he could not pass by an effort to urinate, that he either had some prostatic obstruction, or a paralysis of the bladder, otherwise he could have passed his urine. I then made a rectal examination of the prostate gland by introducing my finger into the rectum, and exploring the best I could, whereupon I found the left lobe of the prostate gland very much enlarged and congested, and very painful, so much so until I could scarcely complete my examination on account of pain produced by pressure on the prostate. I inquired if he had ever had gonorrhea. He told me that he had had it twice, once about eight years previous, once about six years previous. That so far as he knew he had been cured of that. I asked him if he had ever had syphilis. He said not that he knew of. I asked him if he had ever had a sore on his penis, and he said not that he knew of, and I impressed that upon him as I am always suspicious of syphilis in the case or cases such as his presented itself to be. Q. Right there, did he say anything about the Wasserman test? A. I did not put it that way to him. I asked him if he had ever had a blood test made by any physician who had examined him previously. A Wasserman test is a test made for syphilis in the blood. I asked him if he had ever had a blood test made for syphilis. He said that this specialist in Greece —he did not call his name—had made a blood test and said his blood was all right. Then I told him that he would have to wait until I examined his urine and looked further into his case, and perhaps I might be able to give him a more definite answer; for him to return the next morning and I would see him again at the sanitarium, whereupon he went away. Several hours later I was called up over the phone by Memtsas and asked to come to see Mr. Theodore. I asked him what was the trouble. He said that Theodore had had a big chill. I was informed that Mr. Theodore had had a big chill, and wanted me to come and see him. I directed him to tell Mr. Theodore to keep in bed and keep

quiet, and I would see him the next morning. I did not go to see him that night. The next morning I took the specimen of urine to my office and made a chemical and microscopic examination of same. Chemical analysis showed only a slight trace of albumen, which I took to be due to the pus in the urine. The urine was alkaline in reaction, and of a very specific ammoniacal odor. After centrifuging same and taking a specimen and placing under microscope, I found it loaded with pus, considerable blood; no granular casts; no hylan cast, but some epethennal desgrinations. Mr. Theodore returned the next morning after having first visited the sanitarium the previous evening for another examination. I again tried to irrigate, but could not, as he said he had no urine in his bladder; that is, he did try and couldn't get it out. That he again wet the bed last night, whereupon I attempted again to irrigate his bladder by what is known as the Valentine method. This is a method by which the bladder may be irrigated without passing instruments into the bladder, but by this method I could not succeed in getting anything, any water, to pass into the bladder. Then I again attempted to pass a metal catheter by which I expected to irrigate his bladder, but he was so nervous and irritable that he jumped off of the table and said it hurt so bad that he could not stand it. Then I told him we would have to abandon it. He wanted to know if I couldn't do him some good by an operation. I explained to him that he was suffering from a violent chronic cystitis, also a chronic prostatitis, and that his bladder was evidently paralyzed in so far as its functionating power was concerned. That his bladder was full of pus, and unless that was relieved, that he would gradually absorb the poison, and there was great danger of this poison going to kidneys and involving these organs. That his condition was very likely growing continuously worse in the way of urinary poisoning, unless this infection could be gotten rid of, and since we were unable to irrigate his bladder from the fact that in doing so gave him a urinary or septic chill, it would not be wise to undertake to pursue that plan of treatment. That I thought under the circumstances to rid him of that trouble would be to open his bladder above the pubic bone, put in a drainage tube, and then we would thoroughly wash his bladder without giving him any pain. That that operation in itself was not a particularly serious operation, neither would it necessarily cause him a great deal of pain. Then after draining and irrigating his bladder for several days, if we thought it advisable, we could later operate upon the prostatic gland, as his physical condition would be in very much better shape to withstand the operation, and there would be a great deal less danger of the post-operation affecting the kidneys. That while I could readily outline an enlarged prostate through the rectum, I would be able to make a more complete examination after I had opened the bladder and examined both ways, per bladder and per rectum at the same time, then if we

decided and his condition warranted, that we could operate on the prostate later, whereupon Mr. Theodore told me to do whatever I thought was best. That he was ready to have anything done in order to try to get some relief. I did not at any time tell Mr. Theodore that the operation would restore him to a new man. It would have been impossible for me to have made that statement to Mr. Theodore at his first visit to see me because I had not completed my examination. I had not even examined the urine. I did not know but what the man had Bright's disease because I had not analyzed the urine. Therefore it would have been impossible for me to have made any such statement to Mr. Theodore. It is always my rule to make a very conservative prognosis in any major surgical disease, and specially would it be so in a case that has been dragged from doctor to doctor for two years without any relief. I explained to Mr. Theodore that I could see no reason for paralysis in the bladder, which he had, unless there was some spinal lesion controlling these parts of which he had no other symptom. There were no symptoms other than paralysis of the bladder and incontinence of urine that suggested spinal lesion to me. Neither could I see any reason for the incontinence nor the paralysis except a spinal lesion, and in spite of other symptoms being absent, my conclusion was that he had a spinal lesion controlling these organs, but notwithstanding that on the account of the imminent danger Mr. Theodore was in from his accumulating septic condition as a result of the infection in the bladder, I advised him to have the operation to which he readily consented. I mean the immediate opening and draining of his bladder, explaining at that time that we would consider the prostate later on. That when I opened the bladder, as I have just stated, that I could examine the prostate and determine better at that time. Q. Did you indicate to him or tell him that he had a stone in the bladder? A. No. In regard to the stone, I did show Mr. Theodore a stone that was taken from an old man a few days before Mr. Theodore came. There happened to be others looking at this stone, and I showed it to Mr. Theodore more as a curiosity than anything else. I did not tell him that I thought he had a stone in the bladder. Mr. Theodore, after his second visit to the sanitarium, and after he had decided that the best thing to do for him was to open his bladder and drain it, went back to Opelousas to get ready to return to the sanitarium for this operation. When he came back I again attempted to wash his bladder out with the same results as before. Then he was given a room and prepared in the usual manner as all patients are prepared for major operations. On the following day he was operated on by making a superpubic opening in the bladder, the bladder thoroughly explored, and an examination made of the prostatic gland, with one finger in the rectum and one finger in the bladder, thoroughly outlining the prostate in every way. The bladder was found to contain large quantities of pus, some blood, and a large quantity

of urine. Drainage tubes were put in the usual manner, and the bladder was thoroughly washed out while the patient was on the operating table. Patient was put back to bed in fairly good condition, and the irrigation kept up every day during the rest of the time he stayed in the sanitarium. After about a week or ten days, we did a partial prostatectomy upon him. Upon my examination at the time of the first operation I found the left lobe of the prostate to be much larger than the right lobe, and as I believed it to be chronically inflamed, and would act as a source of pain and discomfort, and perhaps to a certain measure increase the outflow of urine from the bladder, I thought it might be better if it were removed, as I was anxious to give this patient every opportunity had to benefit him. I told him that if I were he while at the sanitarium, while it might not be necessary, and would not be necessary to save his life, that I thought it advisable to have that chronically inflamed prostate removed. That I did not see how in any way it could possibly do him any harm to remove this portion of the gland, but it might be of benefit to him, whereupon he readily gave his consent. He told me that I was the doctor, and to do everything I thought best. That he had placed himself in my hands for treatment. That he had confidence in whatever I would do. I thought it best to remove a portion of the prostatic gland, and acting upon my judgment I did so, which operation was done under strict aseptic conditions and precautions, and by the latest methods indicated, for the gland which was in its present condition. I took every precaution in the steps of said operation in the removing of the left lobe in such a way as not destroy the ejaculatory ducts, remarking at the time that in the case the man should ever be so fortunate to regain his potency he would have his ejaculatory ducts."

Dr. Ellis then goes on to detail the further treatment of plaintiff. He says that in the course of the physical examination which he gave plaintiff before the operation he took him through several of the usual tests for discovering the presence of syphilis in the system, but not the Wasserman test. He was questioned, and answered, as follows:

"Q. When did you arrive at the conclusion that you should remove the prostate or any portion thereof? A. When I first operated on the bladder, I decided, after examining the prostate as before stated, I decided that it would be perhaps better for this portion of the prostate gland to be removed than it would be for it to remain. Q. When did you learn that plaintiff was afflicted with tabes? A. Upon my first examination, I learned that he had some spinal lesion that was interfering with the nervous reflexes controlling his bladder. I was not absolutely positive that

it was tabes. The supposition would be, as I have stated before, that it was very probably tabetic nature. Q. When did you become absolutely convinced of the fact that the patient was tabetic? A. When I was absolutely convinced that the paralysis of the bladder persisted in its failure to respond to the normal reflexes of the mucosa of the bladder, there could be no other conclusion except a spinal lesion, and as the motor nerve centers of the nerves were not abolished, the conclusion was that the lesion must involve the posterior spinal roots, which are the centers involved in tabes. Q. I again ask you the question, when did you become absolutely convinced that the patient was tabetic? A. When I operated on his bladder. Q. At the time of the first operation? A. I was suspicious of it before the first operation, and after that operation I was fairly positive he had tabes. Q. When did you become firmly convinced that he was tabetic? A. Between the time of the first operation and the second operation. Q. Did you become firmly convinced of the idea that the patient was tabetic before you performed the second operation? A. Yes, fairly so. You cannot be absolutely positive about those things at times. Q. You became as positive as you possibly could be? A. Yes, I became as positive as I am now. Q. Then you had reached that conclusion prior to the performance of the second operation? A. I was suspicious of it prior to the first operation. I was as positive after the first operation as I am now. Q. That was before the second operation? A. Yes, sir. * * * Q. If your answer is correct, why the necessity for further operations? A. After the bladder was drained and the septic condition to a certain extent cleaned up and the patient had reacted to a certain extent from the absorption of toxines caused by pus in the bladder, I thought by removing a portion of the prostate, which was chronically inflamed, that I could relieve the patient of a source of infection that it would relieve him of further prostatic pain. It would in all probability lower the floor of the prostatic urethra and lessen the obstruction to the retention of urine, and thereby render him less liable to an early reoccurrence of cystitis. Q. Would treatment cure the inflamed prostate? A. Possibly so. Q. Would any other kind, except removal, cure it? A. It might. Q. You never resorted to massaging of his prostate, did you? A. No, sir. Q. What disease of the prostate can be alleviated by treatment and not by operations? A. Chronic inflammation can be relieved by long courses of treatment; sometimes the inflammation in its chronic form might resist a long course of massage according to such authorities as Dr. Hugh Young. Q. Outline a treatment for chronic prostatitis. A. That is treated in many different ways. It can be treated by massage; this is the only treatment that is worth anything outside of an operation. You can use irrigations, but chronic prostatitis is very obstinate trouble. Q. State briefly why the second operation was performed. A. Because I found the prostate very much enlarged by this

chronic inflammation, and as the patient had stated to me that he had been massaged from time to time for the last two years without any benefit, and at the advice—through the writings of such an eminent authority as Dr. Young, of Baltimore, I decided the best course to pursue would be to remove that portion of the prostatic gland which seemed so much inflamed, rather than to temporize with massaging same. Q. What relief did you have in mind when you removed a portion of the plaintiff's prostate? A. To relieve him of the local infection that was existing in this gland. Q. The local infection you refer to was chronic and enlargement of the prostate? A. The left lobe. Q. Have you any idea what produced this condition in the left lobe of the plaintiff's prostate? A. Bacteria infection. Q. Well, define this bacteria infection. A. Well, it may have been various; one of many. Don't know what bacteria was infected, but it was infected just the same. Probably streptococcic, staphylococcic; probably gonorrhea origin. It may have been any of those three, or others. Q. But in your examination you did not definitely determine of which origin it was? A. No, sir. Q. Now, regardless of what origin it may have been, is this method a safe one, either surgical or therapeutic? A. Methods of treatment vary according to the case. Q. Now, without determining the specific cause of this enlargement and inflammation, you resorted to the surgical method of treatment? A. Yes, sir. Q. Well, would it have been possible, doctor, by examination, for you to determine the exact cause of this chronic enlargement and inflammation you refer to? A. Do not think so. Not until after the gland was removed; then it would have been. Q. An examination of the prostate fluid or secretion would not have aided you in any way, microscopic or otherwise? A. It might possibly do so to a certain extent; that is, you might differentiate one from the other. Q. Well, if you were to differentiate it, would it require a different method of treatment? A. Not in the present condition of the gland. In my opinion the method would have been the same treatment. Q. It was and is your opinion that the surgical treatment was the only treatment necessary in this case? A. I consider it the best treatment. Q. Do you consider it the best treatment now, or the best then? A. I consider it the best now, and then, too. Q. Well what did you hope to cure the plaintiff of when you cut out a portion of the lobe prostate? A. I hoped to cure him of this chronic infection of the prostate gland. Q. Yet you were not able to say what this infection was at the time? A. It made no difference in my opinion what the origin of the infection was. The present condition of the gland showed that the quickest way of relieving the pain was to remove this infected area. Q. Now, in arriving at this opinion as to the necessity of this operation, you had no previous experiences upon a living subject, but relied solely upon your theoretical training? A. I have had considerable training in the treatment of prostatitis. Q. Why should drain tubes

inserted in the first operation have slipped from the bladder? A. That often occurs. Q. Is it possible for such tubes to slip out of place if properly sutured and held in place? A. It is not if the suture holds; sometimes the tissues which the suture are put in will sluff through, and some time the suture becomes absorbed and the tube may slip out, but if it does, it is easy to replace them and hold by the application of adhesive strips."

[1] Plaintiff in his statement that defendant told him that an operation would cure him entirely is corroborated by his friend and compatriot Chris Memtsas, admittedly a truthful man; but defendant testifies that he made no such statement, and could not have made it, as such a thing would have been unethical—that "no doctor, unless he is a thoroughbred quack, would make any such statement to a patient under such circumstances, and especially before he has completed his examination."

We agree in this view of the matter; a physician of the standing of the defendant would hardly make such a representation or promise. We are satisfied that the two witnesses understood as they testify, but that they did so through a misconstruction of what was really said.

[2] If we assume the condition of plaintiff's bladder to have been as serious as defendant describes it to have been, we have to conclude from the testimony of the physicians who testified in the case that defendant was justified in resorting to the first operation; and we find no good reason for not accepting defendant's statement in that regard. That there was inflammation, and of long standing, is a patent fact; how far that inflammation had progressed, and how critical was the situation, defendant alone could in the nature of things know since he was the only physician who made an examination. Dr. Gross, the assistant at the operation, was not questioned on that point, and the two trained nurses did not testify.

But we fail to find anywhere in the record, in fact, even in defendant's own testimony,

any justification for the second operation. It stood to reason that the inflammation of these parts had a cause, and it stands to reason that, before proceeding to operate, it was the duty of the defendant to seek for this cause and ascertain whether it would not yield to therapeutic, or prophylactic, treatment. The testimony of experts ought not to be necessary for establishing that before a man's prostate gland or any part of it is cut out an attempt should be first made to ascertain whether the trouble will not yield to the ordinary methods of treatment whenever the circumstances are such as to allow of it; and it is not pretended that they did not in this case.

Dr. Martin, defendant's witness, testified that an inflamed prostate generally yields to therapeutic treatment. Dr. Williams, defendant's witness, testified that he would try treatment before operating, and so did Dr. Clark, another witness of defendant. Dr. Swords, plaintiff's witness, testifying to what he had observed in the course of several months' attendance on the lectures of Dr. Hugh Young, at Johns Hopkins University, Baltimore, Md., who is considered one of the masters of prostatic surgery in this country, and the very one whose method of prostate operation defendant followed in this case, says:

"I never saw any treatment other than prostate massage utilized in treatment of chronic prostatitis" (inflamed prostate).

And again, that the safer, more certain, and less dangerous treatment "is not a surgical operation, unless serious complications arise."

The reason given by defendant why he operated was that thereby the urethra would be lowered, and a more complete emptying of the bladder be secured. But this same result could have been arrived at by reducing the enlargement by the ordinary methods.

The rule governing the liability of physi-

cians and surgeons for malpractice is stated in 30 Cyc. 1578, as follows:

"A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or error of judgment in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical condition involved, or as to what should have been done in accordance with recognized authority and good current practice."

In order to find defendant liable under this rule we have to conclude from the circumstances of the case that he did not exercise due care and use his best judgment, and in view of the above-recited testimony we cannot escape that conclusion. There was no urgent necessity for an operation; there was full opportunity to try first the course which if successful would have left plaintiff whole, and not subjected him to the danger and suffering of this operation. Judging defendant by ourselves, we are sure that in the place of plaintiff he would have unhesitatingly preferred to try first the therapeutic treatment. Resorting first to the operation was not a mere error of judgment, for which a physician is not responsible, but was dealing lightly with a situation of the utmost gravity to plaintiff.

[3] Plaintiff denies that he consented to the operation; but granting that he did, it was merely acceding to what the defendant told him was the proper course to be pursued, whereas we find that that course was not the proper one, and that the defendant knew it, or should have known it. Besides, defendant does not pretend to have explained to plaintiff that the object of the operation was merely to lower the floor of the bladder, and certainly did not explain to him that that same result might perhaps be accomplished without an operation.

Especially is the foregoing true in view of the fact that the defendant knew that the cause of plaintiff's trouble was syphilis, and that plaintiff had not yet had the benefit of a trial of the salvarsan remedy, the recognized specific for this disease; and in view of the further fact that he knew that plaintiff was tabetic, and therefore knew, or should have known, that, as Dr. Swords testified, a surgical operation should be avoided if possible—a tabetic person not being a good surgical risk.

And the case is much aggravated by the fact that plaintiff adopted for making the operation the perineal route, which is unusual, the more dangerous, and one which he himself had never tried before on a living subject.

[4] We think defendant was at fault, and that plaintiff is entitled to damages, but when we come to fix the amount we experience the greatest difficulty. The elements which we find to be certain are the suffering resulting from the operation and the danger which plaintiff was made to undergo, unnecessarily for all the record shows, and the perhaps unnecessary loss of one of the lobes of the prostate.

The loss of virility, of which plaintiff complains, is due we are satisfied to his tabetic condition resulting from syphilis. Whether his diminished control over the muscles of the bladder is due in any, even the slightest, extent to the prostatic operation is left in doubt by the evidence, and therefore cannot serve as a basis for judgment.

Upon the whole we have concluded that a judgment for $2,000 would do justice in the case.

[5] Plaintiff paid the bill of the sanitarium apart from the charge for the services of defendant, and refused to pay the latter, and defendant asks judgment against him for same, $150. Under the view which we have taken of the case, defendant is entitled to charge for the first operation, but not for the second. In the absence of a separate charge for each of the operations, and of evidence as

to the value of the services for each separately, we ought in strict logic to reject the claim entirely for uncertainty; but the court may, we think, take judicial knowledge of the fact that the charge for an operation is not according to any fixed rule, and, subject to defendant's complaint on application for a rehearing, will make the separation, and give defendant judgment for $75.

The judgment appealed from is therefore set aside, and it is now ordered, adjudged, and decreed that the plaintiff, Anastople D. Theodore, have judgment against the defendant, E. M. Ellis, in the sum of $2,000, with legal interest from this date, and that the defendant have judgment against the plaintiff for the sum of $75, and that the two judgments extinguish each other by compensation to the amount of the smaller judgment; defendant to pay the costs of this suit.

### On Rehearing.

O'NIELL, J. Largely on account of the novelty of the cause of action, in the jurisprudence of this state, a rehearing was granted in this case, in order that the question of liability of the defendant might be more thoroughly discussed and considered. The reargument and reconsideration of the matter has not changed our opinion.

The decree heretofore rendered in this case is reinstated and made final.