[Civ. No. 11793. Second Appellate District, Division Two.—June 23, 1938.]

NELLA MARIE WIRES, Appellant, v. DR. ELMER W. LITLE, Respondent.

Morris Lavine for Appellant.

W. I. Gilbert for Respondent.

WOOD, J.—The plaintiff seeks by this action to recover damages which she alleges were caused by the malpractice of defendant. The action was tried with a jury and upon the termination of plaintiff's evidence the trial court granted a motion for a nonsuit. Plaintiff appeals from the judgment thereafter entered.

According to the evidence presented by plaintiff, she was working on Saturday, March 2, 1935, as a seamstress and accidentally ran a needle into her right ring finger through the second joint, where part of it became imbedded. She was taken to the office of defendant, a physician, who was asked to remove the needle. It was shortly after noon and defendant was about to leave his office, but he stated that he was familiar with that type of case and would have no trouble in removing the needle. At the time plaintiff went to defendant's office her hand was discolored by a dark stain from the goods upon which she had been working. Defendant did not wash the finger or hand but swabbed the finger with a liquid which he stated was iodine. Defendant tried to locate the needle with a Zio-Lite, but was not able to do so. He sent plaintiff to Dr. Ekes, a dentist in the building, who had X-ray equipment for taking pictures of teeth. An X-ray picture was taken, but it was not clear or distinct. Dr. Ekes stated that the picture was not clear because it was wet and that it should have been allowed to stand for some time after being washed, but that this was not done because of the shortness of the time. He also stated that "it was not

very clear and distinct, because I am not in the habit of taking X-rays, only of matters of dentistry''. Although the needle could not be seen from the picture that was taken, no effort was made to secure another picture. Defendant made an incision in the finger and probed for the needle for from four to five minutes without locating it. He put some gauze in the wound to establish drainage, stitched up the side of the incision and bandaged the finger and hand. He gave plaintiff a box of pills to relieve pain and sent her home with instructions to come back the following Monday morning in order to get X-ray pictures. He gave her no further advice or instructions.

Saturday evening the hand became very painful and on Sunday efforts were made to telephone to defendant, but he could not be located. The finger and hand became swollen and in order to relieve pain plaintiff cut the bandages. She became feverish and ill. Plaintiff was taken on Monday morning to Dr. Henderson, who found evidence of infection. An X-ray picture was taken and plaintiff was sent to a hospital, where her hand was put under a fluoroscope and the needle was extracted. Her arm became swollen up to the shoulder and she was treated by Dr. Henderson for two or three weeks, after which time she was sent to the General Hospital, where her finger was amputated.

Dr. Henderson testified that plaintiff was suffering from blood poisoning and that although the infection was present when the needle entered the finger, it could not be controlled otherwise than by subsequent treatment and that the removal of the needle accompanied by free bleeding and washing reduces the possibility of infection. He further testified that plaintiff's general physical condition was not good in that her resistance was low, that she "appeared to be tired and exhausted and worn out from probably a little too continuous hard work".

Dr. Burnight qualified as a medical expert. He testified that he was acquainted with the usual and customary practice in this type of case in Los Angeles; that the effect of leaving a needle in the finger of a person in a run-down condition would be to cause trauma or injury to the tissue and that if allowed to remain it would undoubtedly set up infection; that the leaving of the needle in the tissue was the primary cause of the infection and that as it became more advanced it would develop gangrene. He further testified

that it is the usual and ordinary custom in this community to take an X-ray of a finger before it is incised for the purpose of removing a needle; that where an X-ray is faded and the needle is entirely incased in the finger and not visible to the eye, it would not be the customary and usual practice in this community for a doctor to cut and incise the finger relying upon that type of an X-ray; that due to the infection, and pressure from the swelling, all the tissues and blood vessels in the immediate vicinity would become infected and deteriorated so as to stop the natural flow of the blood stream, resulting in gangrene; that when gangrene sets in amputation is necessary to save the life of the patient.

The rules to be applied in the case of a motion for a nonsuit are too well established to require the citation of authority. The trial court must assume that all the evidence in plaintiff's favor is true and every favorable inference fairly deducible from the evidence and every favorable presumption fairly arising from the evidence must be drawn in plaintiff's favor. Measured by these rules it must be held that the issues should have been submitted to the jury. We are not unmindful of the general rule, which is relied upon by defendant, that in cases of malpractice it must be shown by expert testimony that the damages suffered by plaintiff resulted from the failure of the defendant to possess and use that degree of care and skill ordinarily possessed and used by physicians and surgeons in good standing practicing in the locality. The testimony of the experts in the case now before us was sufficient to meet the requirements of the general rule, considered in connection with the facts established by the lay witnesses. Even in actions for malpractice the jury can consider without the testimony of experts matters which are within the common knowledge of mankind. Although it is necessary that experts be called to establish matters peculiarly within the knowledge of experts there are also ''facts which may be ascertained by the ordinary use of the senses of a nonexpert''. (*Barham* v. *Widing*, 210 Cal. 206 [291 Pac. 173].) If the defendant had undertaken to remove a needle from the ring finger but had made an incision in the thumb it could not be successfully argued that an expert witness would be necessary to establish negligence. In *Rankin* v. *Mills*, 207 Cal. 438, 441 [278 Pac. 1044], the court stated: ''Expert testimony appears in the record to the effect that,

under such conditions, and in view of the fact that no improvement occurred in the limb under the treatment for dislocation of the hip, the next step, logically and scientifically, was to investigate further the nature of the injury by taking X-ray pictures. Indeed, this would seem so obvious as to be a permissible inference without expert testimony on the subject, as would be the conclusion that a failure to do this was negligence.'' (See, also, *Thomsen* v. *Burgeson,* 26 Cal. App. (2d) 235 [79 Pac. (2d) 136]; *Evans* v. *Roberts,* 172 Iowa, 653 [154 N. W. 923].) It might be well argued that it is a matter of common knowledge that a needle accidentally embedded in the finger of a seamstress might cause infection if not promptly extracted; that a clear X-ray picture would be of assistance to the surgeon; and that if an indistinct picture be secured from a dental office an effort should be made to secure a clear picture from those equipped with apparatus for that purpose.

Plaintiff complains that the trial court unduly curtailed the examination of the expert witnesses. In several instances the court erroneously sustained objections to plaintiff's questions. It would prolong this opinion unnecessarily to set forth the various questions, a number of which, being hypothetical, were quite lengthy. Upon a new trial it is to be assumed that the rulings on the admission of evidence will be correctly made. For the purposes of this appeal it is sufficient to state that if a verdict had been rendered in plaintiff's favor it would have found ample support in the evidence admitted.

The judgment is reversed. The attempted appeal from the order denying a motion for a new trial is dismissed.

Crail, P. J., and McComb, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 22, 1938, and the following opinion then rendered thereon:

THE COURT.—The petition for hearing in this court after decision by the District Court of Appeal of the Second Appellate District, Division Two, is denied. However, such denial is not to be taken as indicating approval by this court of the discussion concerning matters of common knowledge

which, it is said, a jury may properly consider in an action for malpractice.

HOUSER, J., Concurring.—I concur in the general order by which a hearing of the cause by this court is denied; but I am not in accord with that part of the order which is to the effect that the denial of the petition for hearing in this court "is not to be taken as indicating approval by this court of the discussion concerning matters of common knowledge", etc.

The language which occurs in the opinion of the District Court of Appeal to which the order has reference is as follows: "It might be *well argued* that it is a matter of common knowledge that a needle accidentally embedded in the finger of a seamstress *might* cause infection if not promptly extracted; that a *clear* X-ray picture would be of *assistance* to the surgeon; and that if an *indistinct* picture be secured from a dental office *an effort should be made* to secure a *clear* picture from those equipped with apparatus for that purpose." (Emphasis added.)

It is obvious that an order of denial of hearing which contains express language that "such denial is not to be taken as indicating approval by this court" of specified discussion which appears in the opinion of the District Court of Appeal, is the equivalent, and is but another way of stating, that the criticized portion of the opinion is *disapproved.*

At the outset, it may be observed that it is questionable whether this court is constitutionally empowered or authorized as an incident to the instant proceeding, either specifically to approve or to "disapprove" of any declaration of law that has been made by the District Court of Appeal.

Of course, it must be conceded that the constitutional provisions are the source of power of the Supreme Court. Apparently sections 4 and 4c of article VI of the Constitution contain the only provisions that have a bearing upon such assumed authority. In the former section, it is provided that "the said court shall have appellate jurisdiction in all cases, matters and proceedings pending before a District Court of appeal, *which shall be ordered by the Supreme Court to be transferred to itself for hearing and decision,* as hereinafter provided"; and the pertinent provision of the latter section is that "the Supreme Court shall have power . . . to

order any cause pending before a District Court of Appeal to be heard and determined by the Supreme Court". (Emphasis added.)

With respect to the instant inquiry, the jurisdiction of the Supreme Court is thus established, and is as fixed as is the jurisdiction of any other court. The constitutional provisions in that regard contemplate only that either a hearing of a cause shall be granted, or that it shall be denied. No middle course is available. If a hearing be granted, manifestly the cause is then before the court for determination; and in that event such a decision and opinion may be rendered as may accord with the views of a majority of the members of the court. But should the petition for a hearing be denied, by no constitutional provision is it implied or even suggested that the court possesses any power other than to make its unqualified order to that effect. In that regard, neither direct nor implied authority is conferred upon the Supreme Court either to modify an opinion theretofore rendered by a District Court of Appeal, or to exercise any sort of supervisory control with reference thereto. It is obvious that without and in the absence of a regular hearing of a cause, if the Supreme Court has authority to *modify* such a decision or opinion in any particular, it should follow that the court may so modify the decision or the opinion as to render it of no effect;—in other words, it might "modify" an opinion of the District Court of Appeal out of existence; and at the same time, in the place of such "modified" opinion, either expressly or impliedly, substitute an opinion and decision which might be to the same effect as that theretofore rendered by the District Court of Appeal, or, at its pleasure or option, expressly reach an opposite conclusion, accompanied by an appropriate opinion,—all without any hearing having been granted.

But even assuming the existence of the constitutional power in this court which herein has been exercised, it is not clear that the "discussion" to which the order herein has made reference, and regarding which "approval by this court" is withheld, does not constitute a fair and correct expression of the law in the matter to which it relates.

Directing attention to the opening words of the "discussion" which apply to each of the several statements thereafter following, it will be noted, not that a positive declaration

is made with reference thereto, but only that *"it might be well argued* that it is a matter of common knowledge", etc. Otherwise stated, the opinion does not purport to declare that either in fact or in law it *is* a matter of common knowledge, but only that whether such conditions exist may be *debatable.* In that light, I fail to discern any ground for "disapproval" by this court. Although not admitted, even should it be conceded that by the criticized language of the District Court of Appeal, an impression was sought to be conveyed that the specified statements actually constituted and were "matters of common knowledge", again I must confess my inability to detect any error therein. Is it not a fact that practically every one knows that either a needle or any other foreign substance which may become "embedded (either) in the finger", or in any other part of the body *"might* (may) cause infection if not promptly extracted"? And in these more advanced days, is there any responsible person who does not know that in treating a patient who has been so unfortunate as to have a broken needle embedded in a finger joint, "a clear X-ray picture (of such joint) would be of *assistance* to the surgeon"? Furthermore, would not common sense indicate that if in the first instance a *poor* or "indistinct picture be secured", either from a dental office or from any other source, "an *effort* should be made to secure a *clear* picture from those equipped with apparatus for that purpose"? A denial of the existence of such knowledge on the part of the average layman amounts to a refusal to accredit to him any observation whatsoever relating to the most common and ordinary conditions that surround transactions and happenings of our daily life. (Emphasis added.)

Nor in my judgment may it properly be declared that either of such assumed statements regarding that which may constitute "judicial notice" was erroneous. In 23 C. J., pages 58, 59, 61, it is declared that "The term 'judicial notice' means no more than that the court will bring to its aid and consider, without proof of the facts, its knowledge of those matters of public concern which are known by all well-informed persons. . . . Courts may properly take judicial notice of facts that may be regarded as forming part of the common knowledge of every person of ordinary understanding and intelligence." And as affecting a situation such

as here is in question, in 15 Ruling Case Law, pages 1101 and 1130 (where many judicial illustrations are cited) it is respectively stated that "Courts will take judicial notice of those facts relating to human life, health, habits and acts known to men of ordinary understanding, . . . ; the general rule is that it is the duty of a court to take judicial cognizance of all matters affecting the public health which are of certainty to general or scientific knowledge. . . . " Within cited cases where it has been held that the court may "take judicial notice" of facts which may include and affect the physical condition of persons, the following several rulings appear: The size of an ordinary man is a matter of common knowledge, which extends not only to height and thickness of the body as a whole, but also to the measurement of the various parts; a man could not accidentally fall through a hole of a certain size; the destruction of the sight of one eye impairs the general power of vision; the instinct of self-preservation will be judicially noticed; also the effect of fright or exposure on the nervous system; the habits and qualities of the more common animals; certain strains and breeds of animals of the same species are more valuable than others; certain objects or events are or are not such as to frighten horses of ordinary gentleness; Texas cattle have some contagious or infectious disease, communicable to native cattle outside that state; certain animals are the natural enemies of others; epilepsy tends to weaken mental force, and often descends from parent to child, or entails upon the offspring of the sufferer some other grave form of nervous malady; man's susceptibility to certain diseases; means or method by which disease spreads from one victim to another; diseases of the skin may be spread in barbershops; reclamation of swamp and overflowed lands may concern the public health; considerations of public health necessitates that streets be kept clean of refuse; hogs kept within thickly populated cities tend to create a condition hazardous to the public health; a high, rank growth of weeds in a thickly populated district tends to injuriously affect the health of the inhabitants; the manufacture of wearing apparel in unsanitary and over-crowded working quarters may promote or spread disease; and that long hours in certain employments are injurious to health.

As a conclusion, it is clear to my mind that that part of the order to which reference hereinbefore has been had, is erroneous.