[L. A. No. 21854.   In Bank.    May 18, 1951.]

PAUL SIMONE, Respondent, v. VICTOR O. SABO,
Appellant.

Gibson, Dunn & Crutcher and Sherman Welpton, Jr., for
Appellant.

Herbert Manasse, Arthur J. Crowley, Belli, Ashe & Pinney,
Hirson & Horn, Crowley & Manasse, and Marion P. Betty
for Respondent.

EDMONDS, J.—A jury awarded Paul Simone damages for the asserted malpractice of Dr. Victor O. Sabo in removing an impacted tooth. The appeal from the judgment entered upon the verdict principally concerns the question as to whether it was a breach of duty for Dr. Sabo, as a general practitioner, to have undertaken such an extraction.

According to the testimony of Simone, when he consulted Dr. Sabo, his teeth were examined and X-rays taken. He was told that several of his teeth should be removed, one of which was the impacted left lower second bicuspid. Dr. Sabo said that the extraction of the impacted tooth would be ''quite an operation'' and ''we may have to call in another surgeon on it, a man who is well known, who knows these things well.'' He was not told that a nerve might be severed as a result of the operation. Dr. Sabo ''just said it was a dangerous operation and I should consult the other dentist; some name, I can't think of it.''

Simone described the operation, which he said he could see by looking at the reflection in Dr. Sabo's glasses. He told the jury that he saw the dentist cut a ''hole'' in the gum, and cut around the tooth. Dr. Sabo then held a chisel against the bone or tooth while his wife, who was his dental assistant, struck the chisel with ''a little silver hammer.'' Dr. Sabo told her that she was not hitting ''hard enough,'' and finally said, ''Go get the other hammer. That ought to knock it out.'' She then struck the chisel with a ''regular nail hammer,'' using both hands. ''She didn't dare to hit too hard and he was telling her to hit harder so finally she hit it real hard and something cracked and he said, 'Now, again,' and 'again,' and each time I was just almost going way over. . . . Then all of a sudden she hit it real hard and the hammer flew off, I mean the head, and just grazed me like that and hit me here (indicating), and when she hit me hard I passed out,'' When Simone recovered consciousness, Dr. Sabo continued using a hammer and chisel and removed the remaining pieces of the tooth. He then applied a packing.

Dr. Sabo, called as a witness under the provisions of section 2055 of the Code of Civil Procedure, testified that he had been engaged in the general practice of dentistry for eight months. His experience included the extraction of approximately one thousand teeth, none of which was an impacted lower second bicuspid. However, he had extracted 40 or 50 other impacted teeth.

, The procedure followed in extracting Simone's tooth was

related for the jury in considerable detail. After placing Simone in the dental chair, he said, he sterilized his instruments. He then gave Simone three injections of novocaine. After ascertaining, by probing, that there was complete anesthesia of the left side of the face, he incised the tissue over the impacted tooth. Employing another instrument, he pulled the tissue from the bone, and began cutting into the bone with a chisel and surgical hammer.

At this point in the operation, said Dr. Sabo, he cut a window in the bone and located the crown of the tooth. Using an elevator, he attempted to dislodge the tooth. Being unable to do so, he used a surgical hammer and chisel, and broke the tooth into small pieces which he removed. After removing all parts of the tooth, he placed five sutures and treated the gum with sulfa paste and iodoform gauze. He then smoothed over the area to prevent pain, took additional X rays, and checked the patient for infection.

Upon cross-examination, Dr. Sabo admitted that, during a part of the operation, he held the chisel while his wife struck it with a surgical hammer. He specifically declared that only surgical hammers of different sizes were used in making the extraction. Mrs. Sabo was not a registered nurse, but had acted as his dental assistant for approximately seven months.

In regard to his conversations with Simone, Dr. Sabo admitted that he did not warn his patient of the danger of injury to the mandibular nerve, other than to tell him that it was a dangerous operation. But he told Simone he had consulted with Dr. Huenergardt, an oral surgeon, and said that this man might be called upon to perform the extraction. However, according to Dr. Sabo, "I made mention of the fact too, that it would be more expensive and, therefore, between us we decided that I would do it."

It appears that, in the removal of the tooth, the mandibular nerve was bruised or severed. As a result, at the time of the trial, Simone had a numbness of a portion of the lower lip and jaw which may be permanent.

Simone presented the testimony of an expert tending to prove that it is customary for a general practitioner to refer the extraction of impacted lower bicuspids to an exodontist or oral surgeon. Such a tooth, the testimony shows, is invariably in close proximity of a branch of the mandibular nerve, and the extraction constitutes "considerable danger to the mental nerve." The expert was asked whether it is

customary practice for a general practitioner in dentistry in Los Angeles to inform a patient prior to the extraction of a tooth such as a lower left second impacted bicuspid, that there may be a serious injury to the mental nerve and the possibility of a resulting numbness of his lip. The doctor replied, ''I think any dentist in Los Angeles who does such an operation would inform the patient of the likelihood of the complication because it is a great likelihood that it would occur.''

An oral surgeon, testifying on behalf of Dr. Sabo, stated that it was customary and proper for general practitioners of dentistry in the locality, observing required standards of care, to extract impacted teeth. He explained that such practitioners are licensed to perform surgery in the area of the mouth. Upon cross-examination, he gave several reasons why a dentist may refer his patient to a specialist, but he specifically stated that it is not the customary practice for a general practitioner to refer a person with a completely impacted left lower second bicuspid to an exodontist for extraction. As he put it, ''many men do their own extractions. As I stated before, it all depends on how the man feels about his ability.''

Concerning the likelihood of injury in the removal of an impacted tooth, the expert told the jury that the danger of traumatization is present whether an exodontist or general practitioner performs the extraction. Traumatization of the mandibular nerve, he said, occurs in approximately 25 per cent of extractions such as that performed by Dr. Sabo. However, he did not know in what percentage of cases the nerve was severed. His opinion, based upon an examination of Simone, was that the nerve had been traumatized, but not severed.

Among other grounds presented in requiring a reversal of the judgment entered upon the verdict of the jury which heard this evidence, Dr. Sabo argues that the failure of a general practitioner to refer a patient to a specialist is not actionable in the absence of proof that, in the treatment of the patient, there was a failure to exercise the degree of skill and learning employed by specialists practicing in the same locality. He also takes the position that neither his failure to refer Simone to an exodontist, or the fact that he did not warn his patient of a possible injury to the mandibular nerve, supports the verdict and judgment because neither was the proximate cause of any injury.

The following instruction was given at the request of Simone: "When a general practitioner is confronted by a case that comes within the field of specialists practicing in the same locality, if the case presents an emergency when no practitioner more highly qualified than he for the service is available, or if he informs the patient of the need or advisability of employing the services of a specialist and of his own lack of special ability for the case, and the patient insists on his personal services, and if he undertakes diagnosis and treatment of the case, the standard of ability required of him is that set by the learning and skill ordinarily possessed by general practitioners in the same locality and of good standing.

"In all other circumstances, if a general practitioner undertakes the treatment of such a case, and if at that time and in the same locality there are specialists of good standing practicing in, and limiting their practice to, the special field that embraces the case in question, it is the duty of that general practitioner to possess that degree of learning and skill ordinarily possessed by such specialists."

This instruction is subject to the same criticism as the one given in *Sinz* v. *Owens,* 33 Cal.2d 749 [205 P.2d 3, 8 A.L.R.2d 757]. Each of them failed to state that there is a duty to refer a patient to a specialist only if, under the same circumstances, a reasonably careful and skillful general practitioner would have done so. The general practitioner's duty must always be measured in relation to the facts in the particular case. In determining a course of action, he may and should consider such elements as the patient's mental and emotional condition, his known financial situation, and the many other variants which a physician meets in treating human ailments.

However, assuming that, under the evidence, Dr. Sabo should have referred Simone to a dental surgeon, there is an entire failure of proof that in extracting the tooth he did not use the skill and care of such a specialist. The question as to whether there was proper care in the treatment of a particular case is one to be determined by the opinions of experts. The failure to use such care can be established only by their testimony. "Negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved. On the contrary, in the absence of

expert evidence, it will be presumed that a physician or surgeon exercised the ordinary care and skill required of him in treating his patient.'' (*Engelking* v. *Carlson,* 13 Cal.2d 216, 220-221 [88 P.2d 695].)

In the record now before this court, no expert witness stated that anything done by Dr. Sabo constituted improper treatment. Neither is there any evidence to show that he did anything which a reasonably prudent and skillful oral surgeon would not have done. For all that appears, Simone's tooth was extracted with the care and skill he would have received at the hands of a specialist.

This absence of evidence was recognized by the trial judge who instructed the jury as follows: ''The technique and procedure in connection with the extraction or removal of a left lower impacted second bicuspid tooth is peculiarly within the knowledge of experts and the plaintiff has not offered any testimony that the technique and procedure employed by Dr. Sabo was not in accordance with the proper and required standards of reputable dentists, exodontists or oral surgeons practicing in this locality, therefore you may not consider that issue in your deliberations in this case.''

The judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

There is ample evidence, under any one of several theories, to support the implied finding that negligence of the defendant proximately caused plaintiff's injuries and the judgment should be affirmed.

Plaintiff's testimony alone would support the verdict and judgment. He stated that, in extracting the impacted second bicuspid, defendant held a chisel and his wife hit it with a little silver hammer; ''she just kept hitting it and every time she would hit it, why, it would jar my head.'' Defendant told his wife to hit harder and finally said, ''Well, this is not doing any good . . . go get the hammer.'' Plaintiff further testified as follows: ''Then she [defendant's wife] stood on this side and she started hitting me with this regular nail hammer, and when I saw that nail hammer I said, 'What is this?' . . . And then he [defendant] says, 'Hit it hard this time.' so then . . . she had both hands on it . . . so finally she hit it real hard and something cracked and he said, 'Now

again,' and 'again' and each time I was just almost going way over. . . . Then all of a sudden she hit it real hard and the hammer flew off, I mean the head, and just grazed me . . . and when she hit me hard I passed out. I mean I fainted. And when I came to again there they were picking up the hammer and they were . . . putting the head back on there." Mrs. Sabo was not a registered nurse, although she had had some training in the use of X-rays and had assisted defendant in his office for about seven or eight months.

The majority hold that improper treatment was not shown, relying upon this proposition: "The question as to whether there was proper care in the treatment of a particular case is one to be determined by the opinions of experts. The failure to use such care can be established only by their testimony." But this rule is subject to the exception clearly set forth in *Barham* v. *Widing,* 210 Cal. 206, at 214 [291 P. 173], as follows: "It is . . . true that cases which depend upon knowledge of the scientific effect of medicine, or the result of surgery, must ordinarily be established by expert testimony of physicians and surgeons. [Citations.] *This rule, however, applies only to such facts as are peculiarly within the knowledge of such professional experts and not to facts which may be ascertained by the ordinary use of the senses of a non-expert."* (Italics added.) This exception has been similarly stated in many cases and is well established. (*Lawless* v. *Calaway,* 24 Cal.2d 81, 86 [147 P.2d 604] ["Where, however, negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact."]; *Agnew* v. *City of Los Angeles,* 82 Cal.App.2d 616, 619 [186 P.2d 450] [". . . where the question of the propriety of the treatment is a matter of common knowledge of laymen, expert testimony is unnecessary in order to establish liability in a malpractice case."]; *Armstrong* v. *Wallace,* 8 Cal.App.2d 429, 439 [47 P.2d 740]; *Walter* v. *England,* 133 Cal.App. 676, 685 [24 P.2d 930]; *Nelson* v. *Painless Parker,* 104 Cal.App. 770, 775-776 [286 P. 1078]; see *Wires* v. *Litle,* 27 Cal.App.2d 240, 243-244 [80 P.2d 1010, 82 P.2d 388]; Swan, *California Law of Malpractice,* 33 Cal.L.Rev. 248, 272.) The stated principle should be applied to this case. It certainly does not require expert testimony to establish that an ordinary nail hammer, wielded

by an untrained person, is not a proper means of extracting a tooth, especially in view of the conceded fact that the particular extraction involved was a delicate and dangerous operation. If plaintiff's testimony were believed, the jury could reasonably conclude that defendant had not only failed to exercise the care and skill required of a specialist, but that he did not use the care and skill of a general practitioner of dentistry.

The majority opinion also states: "For all that appears, Simone's tooth was extracted with the care and skill he would have received at the hands of a specialist." Not only does plaintiff's testimony refute this statement, but there is expert evidence to the effect that the injury suffered by plaintiff would not have occurred in the course of proper treatment. The extraction took place in May, 1948. Plaintiff testified that his lip, chin and the side of his face were still numb at the time of the trial. Dr. Schoen, a dentist practicing in Los Angeles who was called as a witness by plaintiff, stated that a nerve "probably had been" severed where, after the extraction of an impacted bicuspid, a man's lip remained numb during the period in question. Dr. Felsen, an oral surgeon, testified for defendant. On direct examination, he gave this testimony: "From the X-ray that I see here *there wouldn't be any danger of severing the nerve* because the nerve is not involved in the impacted tooth, but the tip of the tooth is very close or resting upon the mandibular canal in which the mandibular nerve rests, and in executing the procedure to remove that tooth, the tooth might be tipped inadvertently in such a way as the end of the root might injure it, *but I doubt very much that it would sever the nerve in this particular case.*" The following testimony was given on cross-examination of this witness: "Q. Therefore, isn't it true that there would be considerable danger of either severing the mandibular nerve or the mental nerve if the tooth were to be extracted? A. *Not this particular tooth, no. . . .* Q. In other words, would you say that there was no danger of severing a nerve in the vicinity of this particular tooth? A. I wouldn't say there was no danger of severing it, *but I can't see with the position of the end of the root in this particular X-ray how the nerve could be severed.* It could be traumatized, as I stated before, yes."

The plain import of Dr. Felsen's testimony is that, while the mandibular nerve might be unavoidably *injured* during the extraction of the particular tooth, a dentist using proper

care and skill would not accidentally *sever* the nerve. It is settled that, to establish his case, the plaintiff in a malpractice action may rely upon expert evidence introduced by the defendant. (*Trindle* v. *Wheeler,* 23 Cal.2d 330, 335 [143 P.2d 932] ; *Blakeslee* v. *Tannlund,* 25 Cal.App.2d 32, 36 [76 P.2d 216].) Negligence is a reasonable inference to be drawn from the foregoing evidence, that is, that inference could be based upon the expert testimony tending to show that defendant severed the mandibular nerve in plaintiff's mouth in removing the bicuspid and that such an injury would not ordinarily arise in the absence of negligent treatment.

I cannot agree with the statement in the majority opinion that the instruction given here with respect to the duty of a general practitioner who undertakes the treatment of a case within the field of specialists is subject to the same criticism as the one given in *Sinz* v. *Owens,* 33 Cal.2d 749 [205 P.2d 3, 8 A.L.R.2d 757]. The instruction criticized in the Sinz case stated that if a physician or surgeon undertakes professional service "in a special branch of medical, surgical or other healing science, and if at that time and in the same locality there are members of his profession who specialize in, and limit their practice to, that particular branch of the healing profession, it is his duty to possess that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing who engage in that special practice in the same locality." Unlike that instruction, the one given in this case sufficiently sets forth the circumstances under which a general practitioner is not held to the standard of ability of a specialist and it is not substantially different in effect from the instruction suggested in *Sinz* v. *Owens, supra,* page 758. The instruction here told the jury that the standard of ability required of a general practitioner "is that set by the learning and skill ordinarily possessed by general practitioners in the same locality and of good standing" if there is an emergency or if he informs the patient of the necessity of a specialist's services and the patient insists on the services of the general practitioner. In my opinion, such an instruction sufficiently states the elements to be considered in determining the duty of the general practitioner. Certainly the financial ability of the patient to employ a specialist is not a matter for the dentist or physician to pass upon.

Moreover, it is apparent that the instruction was framed to cover the issues raised by the evidence, namely, whether it is

the customary practice in Los Angeles for dentists to refer patients to specialists for extractions of impacted second bicuspids, and, if so, whether plaintiff was sufficiently advised of this fact and nevertheless insisted that defendant do the extraction.

Apart from the evidence tending to show negligent treatment of plaintiff, there is other evidence which would warrant a finding that defendant was negligent in undertaking the admittedly dangerous operation without sufficiently informing plaintiff of the hazards involved, thereby unreasonably exposing plaintiff to the risk of the very injury which occurred. Plaintiff's testimony was that Dr. Sabo told him that the operation was dangerous, but did not advise him that a nerve might be severed or that his mouth might be numb or paralyzed. Dr. Schoen testified as follows: "Q. Have you an opinion, Doctor, as to whether or not it is customary practice for a general practitioner in dentistry in Los Angeles to inform a patient prior to the extraction of a tooth such as that lower left second impacted bicuspid, that there might be a serious injury to the mental nerve and the possibility is that his lip may be left numb? A. I think any dentist in Los Angeles who would do such an operation would inform the patient of the likelihood of the complication because it is a great likelihood that it would occur." In answer to a similar question, Dr. Felsen stated: "Well, I think that the average dentist would advise the patient that there were certain elements of risk or danger to certain other structures in the removing of the impacted tooth. It probably would vary with different practitioners to what degree they would explain that to the patient." Dr. Felsen also testified that dentists "usually do advise" patients of the danger of traumatizing a nerve in extracting the tooth in question and stated that the nerve is injured in about 25 per cent of such extractions.

"[A]ctionable negligence in cases of this kind consists in doing something which the practitioner should not have done, or in omitting to do something which he should have done. . . ." (*Roberts* v. *Painless Parker*, 121 Cal.App. 264, 268 [8 P.2d 908].) Here, the jury was entitled to find that defendant, before making the extraction, failed to adequately inform plaintiff of the "great likelihood" of serious injury to the mandibular nerve, that such omission constituted a failure to exercise the care ordinarily practiced by dentists in the community, and that plaintiff would not have submitted to the operation if he had been properly warned. The situation is analogous

to cases where the dentist or physician performed a dangerous operation or used a dangerous method of treatment without informing the patient that other, less hazardous, treatment was available. (See *Vigneault* v. *Dr. Hewson Dental Co.*, 300 Mass. 223 [15 N.E.2d 185, 129 A.L.R. 95] ; *Theodore* v. *Ellis*, 141 La. 709 [75 So. 655].)

For the foregoing reasons I would affirm the judgment.

Respondent's petition for a rehearing was denied June 14, 1951. Carter, J., voted for a rehearing.