[S. F. No. 22607. In Bank. Oct. 4, 1968.]

ERIKA MEIER et al., Plaintiffs and Appellants, v. ROSS GENERAL HOSPITAL et al., Defendants and Respondents.

John G. Buresh and Buresh, Garety, Vallarino & Costamagna for Plaintiffs and Appellants.

Spridgen, Moskowitz, Barrett & Achor, John H. Moskowitz, Bledsoe, Smith, Cathcart, Johnson & Rogers and Robert A. Seligson for Defendants and Respondents.

TOBRINER, J.—Plaintiffs, the widow and minor children of decedent Kurt Meier, brought this action against defendants Ross General Hospital and James M. Stubblebine, to recover damages for the alleged wrongful death of the decedent. While a patient in the psychiatric wing of the hospital and under the care and supervision of Dr. Stubblebine, decedent committed suicide by jumping head-first through an open window of his second floor room. Following a trial before a jury, the verdict favored both defendants. Plaintiffs appeal from the judgment.

The assignment of errors includes the following question: Did the trial court commit prejudicial error in rejecting a requested instruction which explained that plaintiffs were not to be deprived of the benefit of a res ipsa loquitur presumption because of decedent's "voluntary action or contribution" (cf. *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]) if such action or contribution were not the "responsible cause" of death? (See *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465, 470-471 [62 Cal.Rptr. 577, 432 P.2d 193].) We hold that such a refusal constituted error,[1] because *Vistica* requires such an

---

[1]The Court of Appeal declined to consider this determinative issue on appeal because the plaintiffs, having failed to raise the point in their opening brief, could not do so later without "good reason." (3 Witkin, Cal. Procedure (1954) Appeal, § 155, pp. 2341-2342.) During the course of this litigation the case of *Vistica* v. *Presbyerian Hospital, supra,* 67 Cal.2d 465, proceeded through the courts. On October 10, 1967, three and one-half months after the plaintiffs had filed their closing brief, the

explanation whenever the facts of a case support a theory of liability based on a duty to protect plaintiff (decedent) from his own actions, voluntary or involuntary. (*Vistica* v. *Presbyterian Hospital, supra,* 67 Cal.2d 465, 470-471.)

Furthermore, we hold that the conditional res ipsa instruction, properly qualified, should be given in this case.　　If those charged with the care and treatment of a mentally disturbed patient know of facts from which they could reasonably conclude that the patient would be likely to harm himself in the absence of preclusive measures, then they must use reasonable care under the circumstances to prevent such harm. (*Wood* v. *Samaritan Institution, Inc.* (1945) 26 Cal.2d 847, 853 [161 P.2d 556].)　　Given this duty and the fact that defendants placed decedent, following an attempted suicide, in a second floor room with a fully openable window, the jury could find from the fact of decedent's suicidal plunge through this window that defendants more probably than not breached the duty of care owed to decedent. Even in the absence of expert testimony which describes the probability that the death or injury resulted from negligence, the jury may competently decide that defendant more probably than not breached his duty of care when the evidence supports a conclusion that the cause of the accident (here, the openable window) was not inextricably connected with a course of treatment involving the exercise of medical judgment beyond the common knowledge of laymen.

Finally, we conclude that we must reverse the judgment and remand for a new trial because the jury's verdict may have been based on the erroneous instruction; prejudice appears from the probability of a determinative application of an erroneous instruction, and this court should not speculate upon the actual basis of the verdict. (*Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

On July 5, 1962, decedent Kurt Meier attempted to commit suicide by slashing his wrists. After treatment for his physical injury, the decedent's family brought him to the Ross General Hospital. Defendant Stubblebine, director of the hospital's psychiatric wing, attended decedent upon his admis-

Supreme Court decided *Vistica*; that decision decisively affected the proper disposition of the present case. Thereafter plaintiffs sought and obtained permission to file a supplemental brief and defendants responded by letter.

The circumstances outlined above provide a satisfactory basis for the unusual practice of considering a point raised for the first time after the opening briefs have been filed.

sion, and during his hospitalization became his personal physician.

The hospital had adopted the "open door" policy for its psychiatric patients. This method of treatment de-emphasizes physical restraint by providing a "homelike" atmosphere in the hospital. The patients are free to move about and even to leave the hospital if they are so inclined. No mechanical security devices are regularly used; the doors are not locked; the windows are not barred.

The policy rests upon the premise that freedom of movement and personal responsibility of patients, even potential suicides, improve the process of their rehabilitation and reduce possible emotional stress. The proponents of the "open door" policy concede, however, that the lessening of physical security exposes a potentially suicidal patient to greater risk. They assert that no amount of security or physical restraint short of rendering the patient unconscious can effectively prevent suicide. Nevertheless, recognizing the risk of suicide in certain patients, the proponents of "open door" therapy normally employ larger staffs to facilitate surveillance and administer chemotherapy to those patients whose symptomatic restlessness and agitation indicate severe depression which may lead to suicide.

The window through which the decedent jumped was not barred in any way; it had no security screen; it was fully openable by means of a crank. The crank could have been removed, and the window secured at a fixed width, by removing a screw. Evidence introduced by plaintiffs at trial indicated that other hospitals employ security windows of a type which would have prevented the accident in this case. Plaintiffs also offered evidence which tended to show that secured windows would not have been incompatible with the "open door" policy. Defendant physician and other defense experts testified that the operation of the psychiatric facilities at Ross Hospital, including the openable windows, comported with accepted hospital and medical standards. Plaintiffs produced no expert witness.

To alleviate decedent's depression, defendant Stubblebine had prescribed a program of chemotherapy. The record indicates, however, that decedent refused to take the medication as prescribed. Although various members of the hospital staff saw and observed decedent on several occasions, the record does not reveal whether the hospital supplied any formal observation or guard. On July 13, 1962, while decedent was

alone in his room, he plunged through the window to his death.

At trial, plaintiffs characterized the openable window in decedent's room as an invitation to commit suicide, a patent violation of defendant's duty of care to the decedent, and a fact of negligence wholly unrelated to the "open door" policy. Plaintiffs also attacked the adequacy of the chemotherapy prescribed and administered to the decedent. In answer, defendants described the treatment and supervision given decedent while in the hospital as exceeding the standard of due care and comporting with good medical practice. Defendants' expert witnesses testified that the "open door" policy as administered at Ross Hospital complied with accepted professional standards. Defendants suggested that the openable window constituted as much a part of "open door" therapy as the unlocked doors. Finally, defendants offered evidence of the difficulty, bordering on impossibility, of preventing an attempted suicide by any sort of physical restraint.[2]

The trial judge gave three distinct negligence instructions: ordinary negligence, medical malpractice, and the questionable res ipsa loquitur instruction. The jury's verdict (10 to 2) favored both defendants.

The trial judge instructed the jury on the doctrine of res ipsa loquitur: "With respect to the doctrine of res ipsa loquitur mentioned by counsel we have this question for you to decide in this case. The question is stated in this way: Whether the accident involved occurred under the following three conditions. First, that it is the kind of accident which ordinarily does not occur in the absence of someone's negligence; second, that it was caused by an agency or instrumentality in the exclusive control of the defendants; and third, that the accident was not due to any voluntary action or contribution on the part of the decedent. And only in the event that you should find all these conditions to exist, you are instructed that an inference arises that a proximate cause of the occurrence was some negligent conduct on the part of the defendants."

Although this instruction meets the requirements set forth by this court in *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 489, we held in *Vistica* v. *Presbyterian Hospital, supra,* 67

---

[2]Defendant Stubblebine testified that patients have committed suicide in a padded cell, while secured and immobilized, by biting their tongues and bleeding to death.

Cal.2d 465, 468-469, that an instruction must be measured by the circumstances of the case in which it was given. (Cf. *Adams* v. *American President Lines* (1944) 23 Cal.2d 681, 688 [146 P.2d 1]; *Schroeder* v. *Baumgarteker* (1927) 202 Cal. 626, 629 [262 P. 740].) In the present case, the plaintiffs offered an instruction which would have explained to the jury that "A plaintiff may properly rely on res ipsa loquitur although he [the decedent] participated in events leading to the accident if the evidence excludes his conduct as the responsible cause." The trial judge refused to give this qualification. We held in *Vistica* v. *Presbyterian Hospital, supra,* at pages 470-471, that just such a qualification must be given whenever the facts of a case support a theory of liability based on a duty to protect plaintiff (decedent) from his own actions, voluntary or involuntary.

The rationale for our holding in *Vistica* rested on the probability that the jury would misunderstand the third condition to the res ipsa instruction to mean that the doctrine could never apply when the decedent's voluntary actions contributed to the accident. The purpose of this condition is to eliminate the possibility that the decedent was responsible for the accident. As Prosser states: ". . . [T]he requirement [absence of any action on the part of the decedent contributing to the accident] may easily be misunderstood. The plaintiff [decedent] is seldom entirely static, and it is not necessary that he be completely inactive, but merely that there be evidence removing the inference of his own responsibility." (Prosser on Torts (2d ed. 1955) § 42, p. 208.) In the present case, decedent had attempted suicide and had been placed in the hospital because of his depressed state and physical injuries. Under such circumstances, we have held that those charged with the care and treatment of a patient, who know of facts from which it might reasonably be concluded that a patient would be likely to harm himself in the absence of preclusive measures, must use reasonable care to prevent such harm. (*Wood* v. *Samaritan Institution, Inc., supra,* 26 Cal.2d 847, 853; *Vistica* v. *Presbyterian Hospital, supra,* 67 Cal.2d 465, 468-470.) The same considerations which led us in *Vistica* to qualify the standard conditional res ipsa loquitur instruction require us to hold in the present case that the trial judge erred in not giving plaintiffs' requested instruction.

Defendants argue that any error in the form in which the trial judge instructed the jury on res ipsa loquitur must be adjudged harmless. They contend that, when the question of

negligence involves a determination of what constitutes proper medical treatment, the jury cannot competently assess the "probabilities of negligence" without the assistance of expert witnesses and that, therefore, the trial judge should not have given any res ipsa instruction in the first instance. They point out that the res ipsa loquitur instruction may properly be given in medical malpractice cases only when laymen (the jury) can infer as a matter of common knowledge that the accident would not have occurred unless the defendant were negligent, or when expert testimony supports the same inference, namely, that the accident was more probably than not caused by defendant's negligence. (*Siverson* v. *Weber* (1962) 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97]; cf. Prosser, *Res Ipsa Loquitur in California* (1949) 37 Cal.L.Rev. 183, 193, 210-212.) Since plaintiffs here could offer no expert testimony on the "probabilities of negligence," defendants contend that the trial court should not have given the res ipsa instruction because the propriety of treatment for mentally ill patients raises questions of professional judgment and accepted medical practice which fall outside the realm of lay or common knowledge.

Defendants' contention raises the issue whether, as a matter of law, the jury could find, without the aid of expert testimony, the conditions precedent to an application of the doctrine of res ipsa loquitur. Stated differently, could the jury find from the mere occurrence of the accident under the circumstances that it probably was the result of negligence by someone and that defendant is probably the person who is responsible? (*Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 408 [58 Cal.Rptr. 125, 426 P.2d 525].) The former probability must concern us here: defendants assert that the jury requires the aid of experts because the questions raised lie exclusively within the province of medical science.

The facts of this case preclude our acceptance of defendants' contention. Ordinarily, if a plaintiff seeks to hold a hospital or a physician liable for a breach of a duty as to the medical care and treatment of a patient, the courts refuse to give a res ipsa loquitur instruction unless the plaintiff has produced some expert testimony[3] which supports an inference of negligence from the fact of the accident itself. (*Siverson* v. *Weber, supra,* 57 Cal.2d 834; cf. *Quintal* v. *Laurel Grove*

---

[3]Under our law, the plaintiff may call the defendant physician and make him the plaintiff's "expert witness" for the purposes of this requirement. (Code Civ. Proc., § 2055; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 89-91 [147 P.2d 604].)

*Hospital* (1964) 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161] ; *Clark* v. *Gibbons, supra,* 66 Cal.2d 399.)[4] The reason for this requirement appears from the following statement: "The law demands only that a physician or surgeon have the degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality and that he exercise ordinary care in applying such learning and skill to the treatment of his patient. . . . Ordinarily, a doctor's failure to possess or exercise the requisite learning or skill can be established only by the testimony of experts." (*Lawless* v. *Calaway, supra,* 24 Cal.2d 81, 86.)

The courts, however, have established an exception to this requirement for the testimony of experts if the subject matter of the litigation is such that laymen could infer *as a matter of common knowledge* that the injury would not have occurred unless the defendant were negligent. (Note, *The Application of Res Ipsa Loquitur in Medical Malpractice Cases* (1966) 60 Nw.L.Rev. 852, 857-864.) The requirement for expert testimony disappears if "during the performance of surgical or other skilled operations an ulterior act or omission occurs, the judgment of which does not require scientific opinion to throw light upon the subject." (*Ales* v. *Ryan* (1936) 8 Cal.2d 82, 98 [64 P.2d 409] ; see, e.g., *Leonard* v. *Watsonville Community Hospital* (1956) 47 Cal.2d 509 [305 P.2d 36], leaving a clamp in the incision following abdominal surgery; *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561], rectal abscess following routine pre-surgical enema; *Friedman* v. *Dresel* (1956) 139 Cal.App.2d 333 [293 P.2d 488], failure to examine or X-ray hip despite complaints of pain in that area.)

In order to sustain the application of res ipsa loquitur in the particular circumstances of this case, however, we need not rely upon the above "common knowledge" exception to

---

[4]*Quintal* and *Clark* permit the application of res ipsa loquitur to cases in which the only basis for the jury's competence to determine the "probabilities of negligence" are the rarity of the accident and some expert testimony supporting *a* negligent cause. That this development constitutes a more liberal interpretation of the scope of res ipsa loquitur has been noted (see *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 421-424, Traynor, C. J., concurring; cf. Prosser, *Res Ipsa Loquitur in California, supra,* 37 Cal.L.Rev. 183, 189-196.) We mention these recent precedents in this context only to point out that the present case is not governed by them. For the reasons presented *infra,* we hold that the question of res ipsa must go to the jury even without any expert testimony when the facts support a finding of probable negligence without regard to the propriety of any distinctly "medical" course of treatment.

the requirement of expert testimony in medical malpractice cases. An obvious instance in which we do not call for expert testimony arises when the facts of a case support a finding of negligence of the ordinary type unrelated to questions involving *materia medica*.[5] (Cf. *Ales* v. *Ryan, supra,* 8 Cal.2d 82, 100.)

In this case Dr. Stubblebine, testifying as plaintiffs' witness under Code of Civil Procedure section 2055, acknowledged that a secured type of window was compatible with the "open door" policy.

"Q: Did you consider the fact that he [decedent] might go out the window? A: Not very much, because there were so many other means available, closer at hand, more certain.

"Q: You didn't know what means he might take? A: No.

"Q: The window was one of them? A: Yes.

"Q: You gave the window no concern at all? . . . [Objection.] . . .

"Q: Your answer was 'not very much.' Did you consider it—to what extent did you consider it? A: I don't know how much weight I gave it. I was more concerned about the many other ways.

"Q: You told me that the cranks of the windows—they would crank open? A: Yes.

"Q: And the crank may be removed? A: Yes.

"Q: You could open it a certain distance and remove the crank, and the only way you could close or open it further would be with the crank? A: Yes.

"Q: Did you give any thought to providing proper ventilation, to remove the crank and—. A: No.

". . . . . . . . . . . .

"Q: You could have secured a type of window and still

---

[5] When the evidence is conflicting, or subject to different inferences, as to whether the alleged negligence is to be measured by reference to the ordinary standard of due care or by reference to the standard of good medical practice set by physicians of good standing in the community, a question of fact arises which must be left to the jury under proper instructions. (Cf. *Davis* v. *Memorial Hospital, supra,* 58 Cal.2d 815, 817.) Such a question emerges in a case like the one before us in which, the facts show a possibly negligent act or omission (i.e., leaving decedent alone in a room with an openable window) which defendant seeks to justify as part of a course of "medical" treatment involving the exercise of professional judgment ("open door" therapy). The jury must determine whether the defendants instituted a course of conduct, or act or omission, for a good faith "medical" reason. The appropriate standard of care to be applied depends on the results of such a determination. (See fn. 6, *infra.*)

leave the doors open, and it would still be the open door policy? A: Yes.

" . . . . . . . . . . . .

"Q: The kind of window a facility might have doesn't change the fact it might otherwise be an open type hospital? A: That is correct."

No testimony introduced by defendants, either specifically or substantially or as a matter of law, rebutted the inference from Dr. Stubblebine's statement that the openable window did not constitute an essential, or even relevant, element of the "open door" policy.

The jury could therefore find negligence in the present case without regard to the propriety or impropriety of an asserted medical justification. We hold that the trial court must submit a conditional res ipsa instruction, even absent expert testimony on the "probabilities of negligence," when the evidence supports a conclusion that the cause of the accident (the openable window) was not inextricably bound up in a course of treatment involving the exercise of medical judgment beyond the common knowledge of laymen.[6] In brief, the "open door" policy does not necessarily call for an openable window; the objectives of the policy can be achieved without leaving an openable window available to the patient.

Having established that the trial judge committed error by failing to give the res ipsa instruction as qualified by *Vistica,* we turn to the question whether plaintiffs suffered prejudice by the error. In *Vistica,* we held erroneous, for reasons similar to those expressed in this opinion, a conditional res ipsa instruction that lacked the qualification as to the *responsible* contribution by decedent to the accident. We said there: "Where it seems probable that the jury's verdict may have been based on the erroneous instruction, prejudice appears, and this court should not speculate upon the basis of the verdict. (*Robinson* v. *Cable,* 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)" (*Vistica* v. *Presbyterian Hospital, supra,* 67 Cal.2d 465, 470-471.)

---

[3] The judge should instruct the jury, however, that if it finds that defendants allowed the decedent to remain in the room with an openable window for a good faith medical reason that is inextricably bound up in a course of treatment involving the exercise of medical judgment beyond the knowledge of common laymen, they must assess this medical reason in the light of the standard of medical learning and skill prevalent in the community. The need for expert testimony in such a case will depend upon whether the subject matter in issue falls within the "common knowledge" exception discussed *supra* at pages 13-14.

In this case, in the context of perhaps necessarily complex and confusing instructions, we could not lightly find an absence of prejudice. We have concluded, as in *Vistica,* that if the res ipsa loquitur instruction had been rendered, it is reasonably probable that plaintiffs would have prevailed. Since we have found that the erroneous instruction could have deprived plaintiffs of a proper application of this doctrine to the present case and that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), we must reverse the judgment.

The plaintiffs assign as errors rulings rendered and instructions given other than those we have discussed. For the benefit of a proper disposition of this case on remand, we shall briefly pass on these points.

First, plaintiffs contend that the trial judge erred in refusing to admit a brochure from the manufacturer of a drug (Mallaril) administered to decedent, which showed the drug to be contraindicated for severely depressed patients. This assignment of error would not, standing alone, require a reversal because plaintiffs' counsel obtained an admission of the contraindication from defendant Stubblebine on cross-examination. Furthermore, the plaintiffs do not present an adequate record for challenging this ruling since they laid no foundation for admission of the brochure and presented no properly informative offer of proof. (*Douillard* v. *Woodd* (1942) 20 Cal.2d 665, 670 [128 P.2d 6]; *Carey* v. *Lima, Salmon & Tully Mortuary* (1959) 168 Cal.App.2d 42, 46 [335 P.2d 181]; *Blackburn* v. *Union Oil Co.* (1949) 90 Cal.App.2d 775, 778 [204 P.2d 69].) For the purposes of retrial, however, we believe that the court should permit the introduction into evidence of such a brochure, not to establish the standard of care, but to show that the physician administering the drug had *notice* of the contraindication. (*Sanzari* v. *Rosenfeld* (1961) 34 N.J. 128, 139, 140 [167 A.2d 625, 631].)

Second, plaintiffs contend that in view of the facts of this case, the trial judge committed prejudical error in rendering the following instruction: "In determining whether defendant's [Stubblebine's] learning, skill and medical conduct fulfill the duties imposed upon him by law, as they have been stated to you, you are not permitted to set up arbitrarily, a standard of your own. The standard was set by the learning, skill and care ordinarily possessed and practiced by others of

the same profession in good standing, in the same or a similar locality and under similar circumstances at the same time. It follows, therefore, that the only way you may properly learn the standard is through evidence presented in this trial by physicians and surgeons called as expert witnesses.''

Although the questioned instruction complies with the decisional rules prescribing the standard of care for medical malpractice cases (*Simone* v. *Sabo* (1951) 37 Cal.2d 253, 257 [231 P.2d 19] ; *Lawless* v. *Calaway, supra,* 24 Cal.2d 81, 86), plaintiffs argue that since they did not challenge the validity of any *medical* diagnosis or treatment the instruction as framed worked error. The record of the case belies this contention. Plaintiffs challenged the adequacy of the program of chemotherapy to accomplish its purpose, namely, to alleviate the decedent's depression and reduce the risk of suicide. Plaintiffs suggested that defendant Stubblebine did not correctly assess the risk of suicide on the part of the decedent, a diagnostic problem. Finally, defendants' asserted justification for the openable window necessarily presented a medical issue, namely, the ''open door'' policy.

 Although issues of medical malpractice did arise in the case, the facts also supported a finding of ordinary negligence without regard to the propriety of any controverted medical diagnosis or treatment. Recognizing this, the trial judge instructed the jury on ordinary negligence, announcing as the standard of care that conduct which, under the circumstances, a reasonably prudent person should follow. The judge attempted to distinguish the two sets of instructions by preceding the word ''conduct'' in the medical malpractice instruction with the word ''medical.'' Plaintiffs correctly assert that these two sets of instructions caused confusion. On remand, the trial judge should make clear to the jury that the medical malpractice and ordinary negligence instructions are perfectly consistent, that it is for the jury to decide which instruction will guide them in determining the standard of care, and that this decision will depend on how it characterizes the conduct which led to the injury : whether the conduct was based on good faith medical reasons or whether the conduct was without any peculiarly ''medical'' justification.

In this respect plaintiffs argue that the trial judge should have instructed the jury on the ''common knowledge'' exception to the rule requiring expert testimony as to the standard of care in medical malpractice cases. As we have explained, the res ipsa loquitur instruction could properly rest upon a find-

ing, here, of negligence of the ordinary type unrelated to questions involving *materia medica.* We have previously discussed for purposes of retrial the matter of an instruction on the "common knowledge" exception (*supra,* pp. 13-14).

■ Third, plaintiffs challenge the trial court's instruction BAJI 214-A (Revised) to the effect that when a physician chooses one of alternative accepted methods of treatment, with which other physicians disagree, and which is in fact unsuccessful, the jury may not automatically deem him negligent. Although this instruction correctly states the rule (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 473-475 [234 P.2d 34, 29 A.L.R.2d 485]), plaintiffs again argue that its rendition here constituted error because no issue of alternative medical treatment arose. Plaintiffs, however, urged at trial that defendants should have used greater physical restraint to protect decedent from taking his life; the line of questioning on the issue of chemotherapy suggested that defendant Stubblebine should have administered more or different drugs to decedent. The evidence thus supported the application of this instruction.

■ Fourth, plaintiffs object to the following rendered instruction: "A physician is not responsible for routine matters performed by him in his absence by a nurse not selected by him but employed by the hospital in which his patient is being treated." This instruction is normally proper. (*Sherman* v. *Hartman* (1955) 137 Cal.App.2d 589, 596 [290 P.2d 894].) In the present case, however, plaintiffs urged two theories of recovery against defendant Stubblebine: One asserted his liability as decedent's personal physician; the other, the doctor's liability in his capacity as director of the hospital's psychiatric wing. Plaintiffs argue that defendant Stubblebine, in his capacity as director of the wing, selected the nurses, or at least may be fairly assumed to have concurred in their selection, and that the nurses worked for him as their superior. Since the record contained no evidence, however, that defendant Stubblebine did participate in the selection of the nurses, the trial court properly gave this instruction.

■ Fifth, plaintiffs claim that the trial judge committed error in giving an instruction which quoted from section 423 of title 17 of the California Administrative Code. This section deals with the requirements for providing hospital rooms with windows "which shall be openable." We concede that this section bears some relation to the issues raised by this case;

we believe, however, that the net effect of such an instruction would be to confuse, rather than to assist, the jury. The official requirement that the windows be openable in design bears little relationship to the question whether defendants should have locked, secured, or screened them. Although the instruction could lead the jury to believe defendants' behavior had received the benefit of some sort of official sanction, we doubt that the instruction caused prejudicial error. To avoid any such confusion on remand, however, the trial judge should eliminate such an instruction, preserving defendants' right to introduce the code section into evidence and argue its relevance to the jury.

■ Sixth, plaintiffs contest the propriety of an instruction limiting the liability of the hospital to action taken by defendant physician only in the exercise of his capacity as the director of the psychiatric wing and not in his performance as decedent's personal physician. Although we recognize the ambiguity inherent in the presentation of the dual theories of liability against defendant Stubblebine, we cannot, merely to eliminate possible confusion, adopt a rule which would extend the liability of the hospital beyond its legal limitations. Plaintiffs argue that this potential dual liability unfairly enables the hospital to divorce itself from amenability for defendant physicians's negligent application of his knowledge or from his careless conduct. The trial judge, however, did give a sufficient and clear instruction that the hospital would be liable for any acts or omissions of the doctor in his capacity as director of the psychiatric wing.

■ Finally, plaintiffs object to an instruction which told the jury that it could not find negligence merely because another treatment acceptable to, or even preferred by, other physicians could have avoided the death. Plaintiffs claim the instruction superfluous because they did not raise any issue of an alternative form of treatment. As we pointed out *supra,* the record renders plaintiffs' contention untenable. The instruction constitutes a proper statement of the rule that, in determining whether defendants breached a standard of care owed decedent, the jury may not engage in "but-for" reasoning.

The judgment is reversed and the case remanded to the trial court for a new trial in accordance with this opinion.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.