**CLARY INSURANCE AGENCY and Gail Brewer, Appellants,**

v.

**James H. DOYLE and Doyle's Fuel Service, Inc., Appellees.**

**No. 4386.**

Supreme Court of Alaska.

Nov. 21, 1980.

H. Russell Holland, George Trefry, Holland & Trefry, Anchorage, and Claire D. Johnson, Severson, Werson, Berke & Melchior, Los Angeles, Cal., for appellants.

Arden E. Page, Burr, Pease & Kurtz, Inc., Anchorage, for appellees.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER,* BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Justice.

This case involves an insurance agency's failure to obtain workers' compensation insurance, and a later failure to notify the prospective insured of its error. In addition to ordering the insurance agency to assume the position of insurer for a loss suffered by the proposed insured during a time when it was not covered, the trial court, based on the jury's verdict, entered a punitive damage award of $190,000. The appellants raise objections concerning the applicable standard of care, the need for expert testimony, an instruction on negligent misrepresentation, and the punitive damage award. Our conclusion is that whatever error may have been committed was harmless, and the judgment of the trial court is affirmed.

About 1972 or 1973, Doyle's Fuel Service, Inc., an Alaska corporation engaged in distributing fuel products, and James Doyle, the owner of the corporation and a separate sole proprietorship engaged in related work, bought all their insurance through the Kenai branch office of the Clary Insurance Agency. Doyle paid his insurance premiums directly to Clary, who, in turn, placed Doyle's policies with various insurance companies. Because of a poor loss year in Alaska in 1975, the Home Insurance Company, which had been underwriting the bulk of Doyle's insurance, notified Clary in 1976 that it would not renew or extend any of Doyle's policies beyond October 15, 1976. Gail Brewer, the manager of Clary's Kenai office, began contacting other companies to replace the policies issued by Home. The cost of obtaining insurance greatly increased. At one point Clary sent Doyle a bill of $143,000 to renew all his policies for the coming year, which compared to Doyle's total renewal premium in previous years of about $20,000.

In the fall of 1976, Doyle met with Brewer in an attempt to lower his insurance costs. The result was a renewal package that cost Doyle $78,000, which the parties agreed would be paid in three equal installments of $26,000.00. Among other items, the renewal package included $16,489 for workers' compensation insurance, and $13,250 for automobile liability. Invoices were sent to Doyle showing these amounts and their purpose. Doyle made the first two installment payments of $26,000 on November 17 and December 21.

Because Brewer was unable to find any carrier willing to underwrite Doyle's workers' compensation or automobile liability insurance, it was necessary to obtain a carrier

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

through Alaska's assigned risk pool. On October 13, 1976, two days before Doyle's workers' compensation insurance was due to expire, Peggy Murphy, a secretary in Clary's Kenai office, prepared a risk pool application for Doyle's workers' compensation insurance. There is no indication that Doyle or any of his employees knew at the time that Clary had applied to the risk pool. Doyle testified that at the time he had never heard of the assigned risk pool.

The risk pool assigned the Fireman's Fund Insurance Company as Doyle's workers' compensation carrier, and notified both Doyle and Clary of this fact by letter dated October 18, 1976. The letter states that the insurance would not be effective until a deposit premium of $3,731 was paid.

Doyle gave the letter to his secretary, Barbara Morton, to ask Brewer about it. Morton testified, "Brewer told me he was going to take care of it and I trusted him." Morton was especially concerned about the effective date of the policy because of the expiration of the prior coverage.

Despite Brewer's assurances, Clary never mailed the premium, and Doyle's workers' compensation insurance lapsed.

Doyle testified that, in the following months when Brewer picked up the installment payments on the renewal package, Brewer mentioned the letter, telling Doyle that it had been a mistake and "we [Doyle] should have never got it." On January 10, 1977, the risk pool notified Fireman's Fund, Doyle and Clary that Fireman's Fund was no longer required to accept the risk because no premium had been paid.

When Doyle and Morton contacted Brewer about this second letter, Brewer failed to advise Doyle of the oversight. Instead, Brewer indicated that for some reason which Morton did not understand, it was not in Doyle's best interest to insure with Fireman's Fund. He said that he had decided to use another carrier and again assured Doyle that he was covered.

On January 21, 1977, Brewer prepared and signed a second application to the risk

pool without Doyle's knowledge. The risk pool responded on January 24, assigning the Alaska Pacific Assurance Company (Alpac) as carrier. Like the letter of October 18, 1976, this letter also required the applicant to submit a premium before the policy would be effective.

On February 1, 1977, Doyle gave Brewer a check for $5,000 as a final settlement on his account.[1] Brewer called Clary's Anchorage office on the same day and instructed it to send a check to Alpac. Although Brewer assured Doyle that the check was hand carried to Alpac's Anchorage office, the undisputed evidence is that Alpac did not receive the check until February 7, and Doyle's insurance did not go into effect until the next day, February 8. Doyle had no workers' compensation insurance between October 15 and February 7.

On or about February 4, Ralph Kline, in the course of his employment with Doyle, was seriously injured in a Jet Alaska air crash. Doyle called Brewer about the accident and was advised to fill out a workers' compensation insurance form. On the form, Doyle left the name of the insurance carrier blank, and the form was taken to Clary's office. Clary never mailed the form to the Workmen's Compensation Board; in fact, it was still in Clary's files when Doyle's lawyer took Brewer's deposition.

On February 7, Brewer traveled to Anchorage with Doyle's file. According to his testimony, he assumed that Alpac had received the check from Clary, and that Doyle was covered. Alpac informed Brewer that they had not received the check until February 7, and would not cover the accident. Doyle claimed he first knew he was uninsured on March 18 when an attorney for Kline called to ask Doyle when he planned to start paying Kline's medical bills and back wages.

During their testimony at trial, Brewer, Peggy Murphy, the Clary agency's secretary, and Lois Clary, vice president of the Clary agency, all stated that it was the firm's policy not to advance funds directly

---

1. This installment was less than $26,000 because of various credits owed to Doyle.

to insurance carriers selected by the risk pool. The defendants' position at trial was that Doyle had received copies of the correspondence from the risk pool, and it was his responsibility to see that these funds were paid to the carrier. Brewer stated that once a carrier had been assigned by the risk pool, it did not require any further action on his part because "the assigned risk pool is a cash transaction between the buyer and the company." Nevertheless, the undisputed facts are that in the course of their three- or four-year business relationship, Doyle had never submitted money directly to an insurance carrier. The Clary agency paid all funds necessary to obtain Doyle's automobile liability policy, which was also assigned by the risk pool. The $78,000 renewal package agreed upon by Brewer and Doyle included $16,000 for renewal of his workers' compensation insurance, and Clary continued to collect the amounts due on the contract even though it failed to remit the money to the insurance carrier.[2] Finally, it was undisputed that Clary in fact ultimately made the payment to Alpac for Doyle's workers' compensation insurance.

**2.** At trial, Brewer testified that the three installment payments were only meant to cover a payment to Gateway Underwriters for $46,865. However, this fails to explain why the three installments were to be paid in equal amounts of $26,000–which obviously totals $78,000, the complete price of the renewal package, not $46,865, the amount of the Gateway policy.

**3.** It is a generally established principle of law that a proposed insured can sue an insurance agent or broker for negligently failing to obtain insurance. The cause of action was apparently first recognized in Alaska in *Coffey v. Polimeni*, 188 F.2d 539 (9th Cir. 1951). *See also Tripp, Inc. v. Kenneth A. Murray Ins., Inc.*, 600 P.2d 1361 (Alaska 1979); *Austin v. Fulton Ins. Co.*, 498 P.2d 702 (Alaska 1972). For collections of cases on the subject see Annot., 72 A.L.R.3d 704 (1976); Annot., 64 A.L.R.3d 398 (1975); and 3 R. Anderson, Couch on Insurance § 25.-46, at 349–53 (2d ed. 1960).

**4.** Clary submitted the following instruction, which was rejected by the trial judge:

 In performing professional services for a client, an insurance broker has a duty to have that degree of learning and skill ordinarily possessed by reputable insurance brokers, practicing in the same or a similar locality and under similar circumstances. It is his further duty to use the care and skill ordinar-

## I. INSTRUCTIONS ON THE STANDARD OF CARE AND THE NEED FOR EXPERT TESTIMONY

■ The appellants' first assignment of error is that the trial court improperly instructed the jury on the appropriate standard of care. In their view, Doyle's action was essentially one for malpractice on the part of an insurance agent or broker,[3] and, as such, the appropriate standard of care was that of a professional in that field,[4] not that of a reasonably prudent person.[5] Clary argues that it was reversible error not to grant their proposed instruction.

■ Clary and Brewer cite numerous cases to the effect that procuring insurance is a complex business that is beyond the cognizance of most laymen.[6] According to the appellants, this case "involves the very essence of an insurance agent's professional responsibilities: the procurement of suitable insurance for his client."

Their argument is meritless. It is plain from the facts that Brewer did not need to

ily used in like cases by reputable members of his profession, practicing in the same or a similar locality under similar circumstances and to use reasonable diligence and in [sic] his best judgment in the exercise of his professional skill and in the application of his learning, in an effort to accomplish the purpose for which he was employed.

 A failure to perform any such duty is negligence.

**5.** The instruction below was submitted to the jury:

 You are instructed that negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence.

 It is the failure to use ordinary or reasonable care. Ordinary or reasonable care is that which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence.

**6.** *See, e. g., Rider v. Lynch*, 42 N.J. 465, 201 A.2d 561, 567 (1964); *Riddle–Duckworth, Inc. v. Sullivan*, 253 S.C. 411, 171 S.E.2d 486, 492 (1969).

exercise any degree of professional judgment in selecting or procuring appropriate workers' compensation insurance. This is not a case where there was a need to have a great deal of knowledge about various insurance carriers, the types of policies available, or the insured's needs. Workers' compensation insurance is required by statute. The risk pool automatically selected a carrier to take the risk. Neither Brewer nor the carrier had any choice as to which insurance company was selected. Procuring insurance from the risk pool involved completing a relatively simple application form that was done in this case by Brewer's secretary.

The issue in this case is whether Brewer was negligent in failing to submit the premium to the carrier and in failing to warn Doyle that he was uninsured. Both of these issues fall within the realm of ordinary negligence.

▪ Not every act of a professional requires an instruction on the professional standard of care. *Meier v. Ross General Hospital*, 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519 (1968), illustrates the point. *Meier* involved a wrongful death action by the widow of a suicide victim who had jumped through an unbarred second story window of a hospital. The court concluded that the case supported instructions on both ordinary negligence and medical malpractice. Issues relating to improper medical diagnosis and chemotherapy treatment required an instruction on the professional standard of care. But the court concluded that an instruction on ordinary negligence was appropriate on the question of whether it was negligent to allow the decedent, who was depressed and had previously slashed his wrists, to wander freely around a hospital where there were no bars on the windows.

▪ The only insurance "experts" who testified at trial were Lois Clary and Brewer. Appellants contend that the trial judge erroneously denied their jury instruction requiring the appellants' actions to be judged solely by expert testimony.[7] In medical malpractice actions, for example, the jury ordinarily may find a breach of a professional duty only on the basis of expert testimony.[8]

▪ As discussed above, however, this was not a case that involved a professional standard of care, and it follows that denying the appellants' instruction on expert testimony was not error. Moreover, even if we were to conclude that the professional standard of care was appropriate, expert testimony is not required where "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness." *People v. Cole*, 47 Cal.2d 99, 301 P.2d 854, 856 (1956). Professor Prosser illustrates the rule graphically by stating, "Where the surgeon saws off the wrong leg, . . . the jury may infer negligence without the aid of any expert." W. Prosser, Law of Torts § 32, at 165 (4th ed. 1971) (footnotes omitted).[9]

There is abundant evidence from which a jury "of ordinary education" could infer negligence.

## II. THE INSTRUCTION ON MISREPRESENTATION

In instructing the jury, the trial judge submitted an instruction which would have

---

**7.** The defendants proposed the following instruction on the professional standard of care:

> You must determine the stardard [sic] of professional learning, skill and care required of the defendant only from the opinions of those persons, including the defendant, who have testified as expert witnesses as to such standard.
>
> You should consider each opinion and should weigh the qualifications of the witness and the reasons given for his opinion. Give each opinion the weight to which you deem it entitled.

> You must resolve any conflict in the testimony of the witnesses by weighing each of the opinions as expressed against the others, taking into consideration the reasons given for the opinion, the facts relied upon by the witness, his relative credibility, and his special knowledge, skill, experience, training and education.

**8.** *See* Annot., 81 A.L.R.2d 597 (1962).

**9.** *See* Annot., 81 A.L.R.2d 597 § 3, at 608–17 (1962); Annot., 141 A.L.R. 5 (1942).

permitted the jury to find Brewer and Clary liable on a theory of negligent misrepresentation.[10]

■ Brewer and Clary argue that the issue of negligent misrepresentation was never pled or proved at trial. However, paragraph V of the complaint states in part that Doyle was "continuously assured that workmen's compensation coverage was in effect." Paragraph IX states:

Doyle's lack of workmen's compensation coverage on February 3, 1977 was the proximate result of the negligence of the defendants.

It seems highly unlikely that Clary and Brewer were not adequately notified by these allegations that Doyle intended to assert a cause of action based upon misrepresentation. Their attorney referred to "representations" during his opening statement to the jury, so he was at least aware that some issue was going to be made of the fact.

■ Furthermore, it is clear that Doyle submitted sufficient evidence to support the cause of action. First, Brewer made false statements. It is uncontested that Brewer's assurances were given at a time when Doyle was without insurance. Second, proximate cause may be found because had Doyle known he was uninsured it is likely he would have paid the premium himself. The premium from the risk pool was a small fraction of Doyle's total insurance cost. Thus, the evidence supports an inference that Doyle would have been insured if Brewer had not misrepresented the fact of coverage. Finally, it is uncontested that Doyle's injuries resulted from his lack of insurance. Therefore, there was sufficient evidence for the jury to find that Brewer's misrepresentations were a cause of Doyle's injuries. The appellants seem to imply that Doyle was contributorily negligent in failing to respond to the notices from the risk pool, but the jury did not agree with that contention, and there is sufficient evidence to support its conclusion.

■ The appellants urge that by submitting two similar theories of negligence to the jury, the trial judge "overemphasize[d] that portion of the case and ... confuse[d] the jury." Ordinarily, a plaintiff is entitled to an instruction "consonant with the theory of her case if such enjoys evidentiary support." *Putensen v. Clay Adams, Inc.*, 12 Cal.App.3d 1062, 91 Cal.Rptr. 319, 334 (1970). We recently noted that "the superior court is accorded broad discretion regarding its instructions to the jury on alternative theories of negligence." *Tripp, Inc. v. Kenneth A. Murray Insurance, Inc.*, 600 P.2d 1361 (Alaska 1979). There is no merit to the appellants' argument.

## III. THE AWARD OF EXEMPLARY DAMAGES

Given the size of the punitive damage award in this case, it is not surprising that the bulk of the appellants' argument is devoted to the subject. Their arguments are discussed here in the order in which they were briefed.[11]

---

**10.** The jury was instructed as follows:

The plaintiff alleges that the defendant made a negligent misrepresentation in informing him that he did have Workmen's Compensation in effect at the time which is the subject of this law suit or in failing to inform him that such insurance was not in effect.

The plaintiff has the burden of proving by a preponderance of the evidence that:

(1) The defendants had a duty to provide the plaintiff with accurate information concerning the status of plaintiff's compensation insurance coverage.

(2) That the defendant violated its duty to the plaintiff.

(3) That the defendants' negligence proximately caused injury to the plaintiff.

On this issue you must find that the plaintiff's reliance on the defendants [sic] statement was justified. If not, you may consider whether there was contributory negligence on the part of the plaintiff.

Alaska recognized the tort of negligent misrepresentation in *Transamerica Title Ins. Co. v. Ramsey*, 507 P.2d 492 (Alaska 1973) and *Howarth v. Pfeifer*, 443 P.2d 39 (Alaska 1968).

**11.** Appellant Clary Insurance Agency does not argue that it may not be liable for punitive damages for the actions of an agent, therefore we do not consider the question. Restatement (Second) of Torts § 909 (1979) discusses the issue.

## A. The Instructions to the Jury

The court initially gave an instruction that stated that punitive damages could be awarded if the jury were to find

> that said defendants were guilty of conduct which can be characterized as outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of plaintiffs.

After deliberating for several hours, the jury requested a further definition of the term "reckless indifference." The court then submitted this supplemental instruction to the jury:

> "Recklessness" is more than ordinary negligence, more than want of ordinary care, and is a wanton or heedless indifference to consequences.

At trial, the defendants objected to this instruction and proposed an instruction of their own that defined recklessness as "a conscious and intentional disregard of the rights of others to the extent that a bad motive [and] an evil intent may be inferred."

On appeal, the appellants no longer argue that actual bad motive need be inferred for conduct to be "reckless." Rather, they now argue that the trial judge's instruction failed to comport with the restatement definition of recklessness found in section 500 of the Restatement (Second) of Torts (1964).

Alaska Rule of Civil Procedure 51(a) governs. In part, the rule states:

> No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

The reason for the rule is to give a trial judge the opportunity to reconsider and, if necessary, to correct an instruction before charging the jury. *Saxton v. Harris*, 395 P.2d 71, 73 (Alaska 1964). It is apparent that a judge must know the nature of the defect in an instruction if it is to be corrected properly.

Brewer and Clary argued at trial that the jury would have to find actual malice, but the Restatement definition of recklessness clearly does not require malice. The comments note:

> Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it.

Restatement (Second) of Torts § 500, comment *f* (1964). If the trial judge had changed his instruction to meet the appellants' objection, he would have given an instruction that would have placed a greater burden on Doyle than either Alaska law or the Restatement requires. Therefore, the objection did not adequately inform the trial judge of a possible error in such a way that the instruction might have been properly corrected. As Wright and Miller note:

> A party may not state one ground when objecting to an instruction and attempt to rely on a different ground for the objection on appeal or on a motion for a new trial.

9 C. Wright and A. Miller, Federal Practice and Procedure § 2554, at 647 (1971).[12]

Furthermore, there is no substantial difference between the standard in the supplemental instruction and the standard defined in the Restatement[13] and in Alaska

---

**12.** In *Reader v. Ghemm Co.*, 490 P.2d 1200, 1202 n.1 (Alaska 1971), there is some suggestion that stating an incorrect theory of law in an objection will preserve the objection. We are satisfied that if a party wishes to urge a new or unaccepted legal theory upon the court such an objection is adequate to preserve the point if the same theory is urged on appeal, but a party is not entitled to urge a trial court to commit error and then switch theories on ap-

peal when it realizes its first view was mistaken.

**13.** The Restatement (Second) of Torts § 500 (1964) provides:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his

case law. The instruction might be compared to the one given in *Sturm, Ruger & Co. v. Day*, 594 P.2d 38 (Alaska 1979), which read in part:

> If you find that Defendant acted with reckless indifference toward the safety of its customers, or that its acts were maliciously or wantonly done, then in addition to any actual damages you may also award a reasonable sum as punitive damages.

In *Sturm, Ruger*, we noted, "Actual malice need not be proved." *Id.* at 46. In *Bridges v. Alaska Housing Authority*, 375 P.2d 696 (Alaska 1962), we said that punitive damages may be awarded for "acts done with malice or bad motives *or* a reckless indifference to the interests of another." *Id.* at 702 (emphasis added).

The supplemental instruction here told the jury that recklessness was "more than ordinary negligence." This compares with the Restatement comments which state that recklessness "must be something more than negligence." Restatement (Second) of Torts § 500, comment *a* (1964). The Restatement further notes that many decisions refer to reckless conduct as "wanton," another term used in the judge's supplemental instruction. Restatement (Second) of Torts at 586 (1964).

Black's Law Dictionary at 650 (5th ed. 1979) states that "heedless," another word used in the supplemental instruction, is "almost as strong as [the] word 'reckless' and includes the element of the disregard of the rights or safety of others."

Nothing the judge said contradicted the Restatement or Alaska law on the subject. There was no error in giving either the original or supplemental instruction.

> conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent. Although the section concerns physical safety, we have granted punitive damages where there is an invasion of a plaintiff's economic interests as well. *See Haskins v. Shelden*, 558 P.2d 487 (Alaska 1976).

## B. Sufficiency of Evidence

 The appellants argue that there was insufficient evidence to support a finding of reckless indifference. They contend that the seriousness of the harm Doyle was exposed to was relatively small compared to a threat of bodily harm, and that Doyle had an excellent history as an insurance risk. From this, the appellants apparently conclude that this was not a case where there was a great probability of harm, so it could not be considered "reckless" for Brewer to allow Doyle to go without insurance.[14]

Clary and Brewer's initial failure to obtain insurance may have been a case of ordinary negligence. By mid–January, however, it was undisputed that Brewer fully realized that Doyle had no workers' compensation insurance, but rather than candidly acknowledge the error to Doyle, Brewer attempted to hide it. He told Doyle that it was in Doyle's interest to use another carrier, and further assured him that he was covered. Brewer apparently assumed that he would have enough time to correct his mistake before Doyle would realize what had happened. Unfortunately, Kline's accident intervened.

Even after Kline's accident, when Brewer realized that Alpac had not received the premium check on time and that Alpac would not backdate the policy, according to Doyle's testimony, Brewer continued to act as though Doyle was covered. Although this point was disputed, Doyle testified that he did not realize he was without insurance until he received the call from Kline's lawyer in March.

In short, there was testimony from which a jury could conclude that Brewer lied to Doyle and had acted with a near total disregard for Doyle's rights. Hiding evidence of

14. This conclusion is fallacious because, in determining whether Brewer acted with reckless indifference to the rights of others, not only must the probability of harm be considered but also the magnitude of harm if the harm occurs. In our view, the reason Brewer acted with reckless indifference to the rights of Doyle is because by failing to acquire the proper insurance, Brewer exposed Doyle to the possibility of severe financial loss.

what may initially have been only negligence was especially reprehensible because it led Doyle to believe that it was unnecessary for him to make any efforts to protect himself.

### C. Subrogation Rights

■ At trial, the judge did not allow Clary and Brewer to present evidence that Doyle had a right of subrogation against Jet Air for the amount of workers' compensation benefits paid Kline. The court denied an instruction to this effect. On appeal, it is claimed that this was error because the jury was not informed that Doyle was actually exposed to a rather small risk. Appellants further claim that the error was compounded because, in evaluating the amount of risk to which Doyle was exposed, Doyle was permitted to argue that he was subject to criminal sanctions.

Although there is some merit to the appellants' argument, under the circumstances any error that may have been committed was harmless. When Clary and Brewer failed to obtain insurance for Doyle, and later failed to advise Doyle of the fact, they could not know what kind of accident might befall one of his employees. They proceeded in the face of this uncertainty. The fact that, events actually occurred, Doyle might have some right of subrogation is not relevant to the appellants' earlier state of mind. When the improper conduct occurred, the likelihood of subrogation rights was speculative. We do not believe that introduction of this evidence would have had any effect on the jury's award of damages.

### D. Criminal Penalties

■ During closing argument, Doyle's lawyer suggested to the jury that Brewer knew that the Alaska Statutes exposed Doyle to criminal liability for failing to carry workers' compensation coverage.[15] Clary and Brewer now object to these state-

ments, but they failed to raise their objection in the trial court until the hearing on their motion for a new trial, long after the jury had reached its verdict. Objections to statements made during closing argument must be given prior to the time the jury is instructed so that the court has an opportunity to instruct the jury to ignore the statement or to submit a corrective instruction. *Manhattan–Dickman Construction Co. v. Shawler*, 113 Ariz. 549, 558 P.2d 894, 901 (1976); *Moody v. Rasmussen*, 274 Or. 605, 547 P.2d 623, 627 (1976). This is not a case of plain error, and the objection has been waived.[16]

### E. Excessiveness of the Award

After trial, the appellants requested a new trial or remittitur on the ground that the punitive damage award was excessive. Both motions were denied, and on appeal Clary and Brewer urge reversal on this ground.

■ The standard of review is whether the trial judge abused his discretion in not granting a new trial or remittitur because the damages were excessive. *Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 48 (Alaska 1979), *modified on rehearing*, 615 P.2d 621 (Alaska 1980). We will intervene to prevent a "miscarriage of justice." *Id.*

On a rehearing of *Sturm, Ruger*, we reduced to $500,000 a $2.9 million punitive damage award made by the trial court. We affirmed a punitive damage award of $25,000 in *Haskins v. Shelden*, 558 P.2d 487, 494 (Alaska 1976), a case which involved conversion of property.[17]

While certainly not applicable to all cases, one rule of thumb is that the punitive damage award should bear some reasonable relationship to the award of compensatory damages, C. McCormick, Law of Damages § 85, at 298 (1935), although in *Sturm, Ruger*, we also noted that "no definite ratio between them is prescribed." 594 P.2d at

---

**15.** Such authority exists under AS 23.30.075.

**16.** In closing argument the appellants argued that the issue of criminal sanctions was a "red herring," but they did not specifically object to the appellee's statements until they moved for a new trial.

**17.** The court affirmed denials of punitive damages in *Schafer v. Schnabel*, 494 P.2d 802 (Alaska 1972); *Hash v. Hogan*, 453 P.2d 468 (Alaska 1969), and *Nissen v. Hobbs*, 417 P.2d 250 (Alaska 1966).

48. During closing argument to the jury, Doyle's lawyer stated that Doyle's liability for Kline's injuries was at least $95,000.[18] In *Sturm, Ruger,* the jury awarded compensatory damages of $138,000; thus, the award of $500,000 in punitive damages was approximately three and one–half times this amount. In this case, the award of punitive damages of $190,000 is roughly twice the amount of the compensatory damages.

We do not imply that punitive damages should always bear a specific ratio to actual damages. As stated in our opinion on rehearing in *Sturm, Ruger,* "[A] comparison of actual damages with the punitive damages is a factor which may enter into the determination of excessiveness. However, there may be cases in which it is of only slight value or is totally inapplicable." 615 P.2d 621, 624 n.3, (Alaska 1980). The only reason for referring to a ratio is "to give the reviewing court a strong hand in controlling potentially excessive punitive awards." D. Dobbs, Remedies § 3.9, at 211 (1973). Of more importance in determining whether the award is excessive are the factors listed in *Sturm, Ruger*: "[T]he magnitude and flagrancy of the offense, the importance of the policy violated, and the wealth of the defendant." 594 P.2d at 48 (*quoting Zhadan v. Downtown L.A. Motors,* 66 Cal.App.3d 481, 136 Cal.Rptr. 132, 143 (1976)).

Although there is an absence of evidence relating to the wealth of the defendants, the conduct was outrageous. Furthermore, it is strongly against public policy for an insurance agent to receive sums for premiums, assure its customer of coverage, yet willfully fail to obtain that coverage. Not only may the customer be damaged, but third parties who are injured may not be able to obtain recovery as a result of the lack of insurance. Given the nature of Clary's and Brewer's breach of duty and the need to promote public confidence in the insurance industry, under the circumstances of this case we cannot say that the trial court abused its discretion.[19]

The judgment of the trial court is accordingly AFFIRMED.

---

**18.** At the time of trial the parties stipulated that Doyle had paid Kline approximately $51,000. After judgment the Clary Insurance Agency paid additional sums owed Kline, including a $40,000 award for permanent partial disability. Because Kline's accident involved the amputation of a leg, by the time of trial it was virtually certain that this award would be made under the schedule of benefits in AS 23.30.190(a)(2). Doyle's argument to the jury that there was a minimum of $95,000 in exposure is thus entirely supportable, and in any event, Clary and Brewer failed to raise a timely objection to it.

**19.** Clary and Brewer raise several objections to the form of the judgment order. With regard to subrogation rights, the Clary Insurance Agency has assumed the position of Doyle's workers' compensation carrier and therefore has the same subrogation rights against Jet Alaska as any other workers' compensation carrier. The appellants' objection that the judgment order might potentially embrace liability to Doyle for other accidents that occurred during the time he was uninsured is frivolous. The judgment order is not defective.